[No. B147015. Second Dist., Div. Five. June 12, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
JASON SCHMAUS et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I., I.A., I.B., I.B.1., I.B.2., I.C., II., II.A., II.C., II.D., II.E. II.F., II.G., II.H., II.I., III., III.A., III.B., III.C., III.D.

## COUNSEL

David H. Goodwin, under appointment by the Court of Appeal, for Defendant and Appellant Michael Beattie.

Janyce Keiko Imata Blair, under appointment by the Court of Appeal, for Defendant and Appellant Danny Wayne Black.

Law Offices of Dennis A. Fischer, Dennis A. Fischer and John L. Ryan for Defendant and Appellant Jason Schmaus.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Jaime L. Fuster and Douglas L. Wilson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MOSK, J.**—Defendants and appellants Michael Beattie (Beattie), Danny Wayne Black (Black), and Jason Schmaus (Schmaus) were convicted of first degree murder, and the jury found true the special circumstance that the murder was committed while lying in wait. At defendants' joint trial, Robert Glenn (Glenn) testified that he and defendants shared the beliefs of the Aryan Brotherhood and Nazi Low Riders, White prison gangs, and that because the victim violated those beliefs by committing a sex offense, Glenn and defendants killed him while they were all incarcerated.

In the published portion of this opinion, we discuss Beattie's argument that his Sixth Amendment right to confrontation was violated by the admission of a statement his nontestifying codefendant Schmaus made that implicated Beattie in the murder. We conclude that the trial court erred in admitting the statement, but hold that the error was harmless.

In the unpublished portion of this opinion, we deal with Schmaus's contentions that the jury was improperly instructed on the lying-in-wait special circumstance and that it was error to admit evidence concerning White prison gangs; we discuss Beattie's additional arguments that Glenn's testimony was insufficiently corroborated, that the trial court erred in admitting evidence of his Ku Klux Klan tattoo, that he was deprived of his right to counsel, that he was denied a hearing under *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44], that an advisory counsel should have been appointed to assist him, that incarcerated witnesses should have been removed to testify on his behalf, and that the court should have instructed the jury on the benefits Glenn received in exchange for his testimony; and we address Black's arguments that Glenn's testimony was insufficiently corroborated, that evidence he possessed weapons after the murder at issue should not have been admitted, and that the trial court

improperly sentenced him to three consecutive life without possibility of parole terms. Each defendant joined the issues his codefendants raised. (Cal. Rules of Court, rule 13.)

We affirm the judgment as to Schmaus. We modify the judgments as to Beattie and Black solely on the ground that they could not be sentenced to three consecutive life without possibility of parole terms and otherwise affirm those judgments.

## FACTUAL BACKGROUND

### *Charlie row in Men's Central Jail*

In May 1995, module 3400 of the Los Angeles County Men's Central Jail consisted of four rows that housed gang members. "C" or "Charlie" row confined White gang members. Although inmates in Charlie row generally were locked up (referred to as "lock down") 24 hours a day, officers occasionally permitted "cell checks," periods during which inmates were allowed to go into a neighbor's cell to socialize. Deputies would open cells from a control booth from which they were unable to see into the Charlie row cells. After cells were opened so that inmates could enter another cell, cells would be locked. When cell check ended, deputies reopened the cells to permit inmates to return to their assigned cells.

### *White prison gangs*

The People's expert witness testified as follows about aspects of the prison gangs. The Aryan Brotherhood is a White prison gang, and the Nazi Low Riders is another White prison gang that performs services for the Aryan Brotherhood. A "peckerwood" or "wood" is a White inmate who has some allegiance to the Aryan Brotherhood or the Nazi Low Riders or their beliefs. Because most Aryan Brotherhood members are in segregated housing, Nazi Low Riders and "good woods"—peckerwoods who abide by the prison rules for White inmates as established by the Aryan Brotherhood—operate in the prison according to Aryan Brotherhood dictates. A wood who wants to associate with a prison gang works for it by, for example, delivering notes written between inmates ("kites") and reporting violations of the Aryan Brotherhood's rules. Those rules include not tolerating—and indeed, killing—inmates involved in sex offenses such as child molestation and rape. A wood shows loyalty to, and earns respect from, a prison gang by murdering someone the gang wants murdered.

Glenn, who admitted to being defendants' accomplice, confirmed in testimony that the Aryan Brotherhood is a White prison gang that establishes

rules for and seeks control over White inmates. He said that those rules include not sharing a cup or cigarette with a Black inmate, not testifying against another about a crime, and not tolerating people who commit crimes against children and women, such as rapists. The evidence suggests that the prison gang has its own structure, economy and rules. Gang members within, and even outside of, the prison system, have developed an operation that in many instances evades prison rules and the law.

*Robert Glenn's testimony*

In May 1995, Glenn was housed in Charlie row after his arrest for auto burglary. Glenn denied being a member of the Aryan Brotherhood, but said he became an associate (someone who works for a member) in 1994. While on Charlie row, Glenn met Steve Hampton (Hampton), whose nickname was "No Brains." On Hampton's first day on Charlie row, Hampton stopped by Glenn's cell, which cell Glenn shared with Black, a Nazi Low Rider, and Richard Miley (Miley).[1] Hampton and Miley had been in prison together previously, and Hampton told Miley he had been charged with raping a woman while committing a residential burglary. Upon hearing that, Glenn, who said his mother's birth resulted from rape, and Black decided to kill Hampton in conformity with the gang code.

Miley, who was present during the discussion, initially protested, but later asked Glenn and Black to delay killing Hampton until after he, Miley, left the jail. Miley left a week to 10 days later, and James Wright (Wright) moved into Glenn's and Black's cell.

Glenn, Black, and Wright devised a plan to kill Hampton. Schmaus, a Nazi Low Rider, agreed to help. But when Black found out that he was going to plea bargain the case for which he was then in jail, he decided not to participate in the actual murder, but said he would supply the "shank," a jail-made knife fashioned for stabbing purposes. Glenn then asked Beattie to participate, and Beattie agreed to replace Black in the plot to kill Hampton.

On May 2, 1995, a cell check was announced after dinner. Glenn, Beattie, and Schmaus went into Hampton's cell, cell 9. Two inmates and Black went into the adjoining cell, cell 8. Glenn choked Hampton until he was weak but conscious and then cut him across his throat several times with a razor blade. From the adjoining cell, Black handed a shank to Beattie, who gave it to Glenn. Glenn stabbed Hampton with the shank while Beattie held his feet. After stabbing Hampton, who was making gurgling sounds and moaning, Glenn gave the shank to Schmaus, who also stabbed Hampton. Schmaus

---

[1]Miley's nickname was "Smiley."

gave the shank to Beattie, who cut Hampton's throat with a razor and stabbed him. Hampton was stabbed numerous times. Beattie flushed the razor down the toilet and threw the shank into a cell corner.

After confirming that Hampton was dead, Glenn, Schmaus, and Beattie put Hampton on the lower left bunk and covered him with a sheet and a blanket. They cleaned blood from the floor with towels passed to them from cell 8, and they left the towels in the toilet. They took off their clothes, passed their dirty clothes to cell 8, washed the blood off their bodies, checked each other for blood, and put on new clothes that had been passed to them from cell 8. The inmates in cell 8 tore the bloodied clothes into strips and flushed them down the toilet.

Black sent a kite to everyone on the row telling them to come out of their cells at the end of cell check so that the deputy could not tell who came out of Hampton's cell. At the end of cell check, everyone came out of their cells.

*Deputies' testimony*

After dinner on the day of the murder, Beattie and several other inmates asked Los Angeles Deputy Sheriff Martin Rojas if Charlie row could have a cell check that evening. Deputy Rojas agreed, and cell check began around 5:00 p.m. From where he was in the control booth, Deputy Rojas saw 12 to 15 inmates come out of their cells and go into other cells. About 15 minutes after cell check began, Deputy Rojas delivered mail to Hampton. Deputy Rojas saw three other people in Hampton's cell playing cards, but he could not recall who they were.

When cell check ended, Deputy Rojas opened the cell gates and told the inmates to return to their own cells. He did not see who came out of which cell. Once inmates were back in their cells, Deputy Rojas and a nurse began delivering pills, at which time they discovered Hampton's dead body lying facedown and covered by a blanket.

Deputies investigating the crime scene found a shank. Deputy Rojas testified he has found shanks inside jail cells hundreds of times. The cell in which Hampton's body was found had visible blood wipe marks, and the toilet was clogged with towels, T-shirts, shorts, and blood. Inmates housed in Charlie row were examined for wounds and evidence of blood. None was found on the inmates. Beattie's palm print was found on a bunk in Hampton's cell above where Glenn said Beattie had been sitting.

It appears that no further developments occurred to help investigators solve Hampton's murder until January 1998, when Steven Arce (known as

"Nazi Steve") (Arce), Schmaus's cellmate in prison at that time, gave a statement to deputies that the deputies recorded. Arce said Schmaus told him that he, Schmaus, "Spanky" (Glenn), and "another guy" killed a sex offender named "No Brains."

On February 22, 1999, the day that Black, Glenn, and Schmaus were arraigned for Hampton's murder, deputies placed a recording device in a holding cell and recorded a conversation that took place in that cell on that date. The participants in that conversation appeared to be discussing Hampton's murder. The parties stipulated at trial that on February 22, 1999, Glenn, Black, and Schmaus were placed in a holding cell together. There was no direct evidence that the tape recording came from the holding cell in which Glenn, Black, and Schmaus were placed.

Glenn gave a statement to the police and a deputy district attorney and entered a plea of guilty to voluntary manslaughter. In return for an agreement to tell the truth at trial, Glenn was to receive a 22-year sentence. Although he was promised protective custody, he expressed concern about retaliation for his testimony.

*Verdict and sentences*

The jury found Beattie, Black, and Schmaus guilty of murder in the first degree and found true the special circumstance allegation that they committed the murder while lying in wait. (Pen. Code, §§ 187, 190.2, (a)(15).)[2] The trial court found true the allegation that Beattie had suffered three prior serious felony convictions and sentenced him to three consecutive life without possibility of parole (LWOP) terms. The court found true the allegation that Black had suffered two prior strike convictions and also sentenced him to three consecutive LWOP terms, consecutive to the 25-year-to-life term he was already serving for possessing a weapon in jail. The court sentenced Schmaus to an LWOP term.

DISCUSSION

I.   *Schmaus's Contentions**

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

II.  *Beattie's Contentions*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .*

---

[2]All further undesignated statutory references are to the Penal Code.
*See footnote, *ante*, page 846.

A. *Insufficient evidence to corroborate Glenn's testimony*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

B. *Schmaus's statement regarding "another guy"*

(i) *Facts*

Before trial, the People moved in limine to admit Schmaus's statement to Arce that he (Schmaus), "Spanky" (Glenn), and "another guy" killed Hampton. Schmaus never testified (having exercised his constitutional right not to testify) and hence was never cross-examined—thus raising a confrontation clause issue. Beattie and Black opposed the motion, but the trial court held, that the evidence was admissible, although the jury was instructed not to consider the evidence against any defendant not involved in the conversation.[8] At trial, the People called Arce as a witness and introduced a statement taken from him when he was incarcerated and recorded by sheriff's investigators in January 1998.

In the transcribed statement, Arce said that in late 1997 he had been doing tattoo work on his cellmate Schmaus. Schmaus asked Arce to put on his wrist "5-2-95." When asked why, Schmaus said that was the day he "and a guy named Spanky [(Glenn)] killed a guy named No Brains [(Hampton)] in L.A. County Jail." He went on to recount Schmaus's conversation about what occurred at the Los Angeles County jail "white gang module" as follows: "He said, uh, that the guy [(Hampton)] was bragging about how he was in for a sex crime with a minor or something to that effect. And the guy named Spanky got upset about it, that the guy was bragging about it, and they had some kind of a unlock or something, where everybody switched cells to get in a cell with their friends that they wanted to be with until chow time or—something to that effect. So him [(Schmaus)], Spanky and another guy went into No Brains' cell, and they played cards and, uh, the deal was when you lost a hand, you had to do push ups. And then No Brain[s] got on the ground to do push-ups, that's when, uh, Spanky started stabbing him. I guess he stabbed him 30 something times and took a break and, 20 something more times, and then made everybody else in the cell hit him a couple times."

At trial, Arce said he did not recall his recorded statement, did not know if the voice on the recording was his, and did not recall the alleged Schmaus

---

*See footnote, *ante*, page 846.
[8]The jury was instructed as follows: "Evidence was also received of a statement made by defendant Schmaus to witness Steve Arce. [¶] At the time the evidence of these statements was received you were instructed that it could be considered by you against the defendants involved in the particular conversation. [¶] Do not consider the evidence of these statements against the defendant wjp [*sic*] were not involved in the particular conversations."

statement. There were suggestions in the record that prior to the recorded statement Arce had a conflict with Schmaus (Arce wrote Schmaus, "yes, I'm still pissed at you and a few others"). In addition, Arce acknowledged he wrote a letter to Schmaus saying that it was hard to "kick the old habits" that consisted of "the stealing, and cheating and all the lies."

### (ii) *Statement involves confrontation rights*

Beattie contends that admission of what Schmaus told Arce violated Beattie's Sixth Amendment right of confrontation under *People v. Aranda* (1965) 63 Cal.2d 518, 530 [47 Cal.Rptr. 353, 407 P.2d 265] (*Aranda*) and *Bruton v. United States* (1968) 391 U.S. 123, 135-136 [88 S.Ct. 1620, 1627-1628, 20 L.Ed.2d 476] (*Bruton*).[9] ▮ In *Aranda, supra,* 63 Cal.2d at pages 530-531, the California Supreme Court held that when the prosecution intends to introduce into evidence the extrajudicial statement of one defendant that implicates a codefendant, the trial court can allow a joint trial "if all parts of the extrajudicial statements implicating any codefendants can be and are effectively deleted without prejudice to the declarant. By effective deletions, we mean not only direct and indirect identifications of codefendants but any statements that could be employed against nondeclarant codefendants once their identity is otherwise established."[10]

▮ The United States Supreme Court in *Bruton, supra,* 391 U.S. at pages 135-136 [88 S.Ct. at pages 1627-1628] held that a defendant is deprived of his Sixth Amendment right of confrontation when the confession of a nontestifying codefendant incriminating the defendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant. In *Richardson v. Marsh* (1987) 481 U.S. 200, 211 [107 S.Ct. 1702, 1709, 95 L.Ed.2d 176] (*Richardson*), the United States Supreme Court said "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence."

▮ A defendant is deprived of his Sixth Amendment right of confrontation if references to defendant's name are merely replaced by a symbol or by a blank space in place of defendant's name. (*Gray v. Maryland* (1998) 523

[9]The Truth-in-Evidence provision of Proposition 8 (Cal. Const., art. I, § 28, subd. (d)) abrogated *Aranda* to the extent it required relevant evidence to be excluded when federal constitutional law did not require exclusion. (*People v. Fletcher* (1996) 13 Cal.4th 451, 465 [53 Cal.Rptr.2d 572, 917 P.2d 187].)

[10]As alternatives to deletion, the court in *Aranda* held that additional options are severing the trial and, if severance is denied and effective deletion of references to the defendant cannot be made, the statement must be excluded.

U.S. 185, 192 [118 S.Ct. 1151, 1155, 140 L.Ed.2d 294].) To avoid a violation of the confrontation clause of the Sixth Amendment, the confession may not contain any reference to the existence of the defendant. (*Richardson, supra,* 481 U.S. at p. 211 [107 S.Ct. at p. 1709].) Thus, under *Richardson* and *Gray,* a reference to "another guy" in the place of the defendant's name does not avoid the Sixth Amendment confrontation issue.

### (iii)   *Lilly v. Virginia*

The Attorney General argues that Schmaus's statement was admissible as a declaration against interest and as being sufficiently trustworthy and was not precluded by *Lilly v. Virginia* (1999) 527 U.S. 116 [119 S.Ct. 1887, 144 L.Ed.2d 117] (*Lilly*). The Attorney General contends that *Lilly* need not be followed because it was a plurality decision, that the statement here is not covered by *Lilly,* and that the statement is admissible under the trustworthiness test.

In *Lilly,* a plurality of the United States Supreme Court said that the admission of an accomplice's out-of-court custodial confession that incriminates the defendant is not admissible as a declaration against interest because it "does not come within a firmly rooted hearsay exception." (*Lilly, supra,* 527 U.S. 116, 134, fn. 5 [119 S.Ct. 1887, 1899].) The court added that when "a court can be confident—as in the context of hearsay falling within a firmly rooted exception—that 'the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility,' the Sixth Amendment's residual 'trustworthiness' test allows the admission of the declarant's statements." (*Id.* at p. 136 [119 S.Ct. at p. 1900]; see also *Ohio v. Roberts* (1980) 448 U.S. 56, 66 [100 S.Ct. 2531, 2539, 65 L.Ed.2d 597] [statement of an unavailable declarant is admissible only if it bears adequate " 'indicia of reliability,' " with such reliability being inferred if the statement "falls within a firmly rooted hearsay exception"; otherwise the statement must be excluded absent a showing of "particularized guarantees of trustworthiness"]; *Cruz v. New York* (1987) 481 U.S. 186, 193 [107 S.Ct. 1714, 1719, 95 L.Ed.2d 162] [the confrontation clause bars a nontestifying codefendant's statements incriminating the defendant if the statements are not directly admissible against the defendant].)

Courts and commentators have read into *Lilly, supra,* 527 U.S. 116, a variety of differing conclusions. The issues after *Lilly* include the following: whether, in view of there being no majority, it is of any binding significance; whether it should be limited to its facts—an entire custodial confession to police by a nontestifying accomplice in which the accomplice implicates and spreads the blame to the defendant; whether it applies to noncustodial

statements or statements to those who are not authorities; whether statements that are not admissible as exceptions to the hearsay rule may be admissible if deemed trustworthy; whether it applies to portions of statements or confessions rather than to whole confessions; and whether it applies to a statement that is truly self-incriminating or to one that is neutral or just to one that is self serving. (Kirst, *Appellate Court Answers to the Confrontation Questions in Lilly v. Virginia* (2003) 53 Syracuse L.Rev. 87 [summarizes cases]; Christianson, *The Future Implications of Lilly v. Virginia* (2001) 55 U. Miami L.Rev. 891.) As one commentator said, "The only thing that is clear after Lilly is that not much is yet certain about declarations against interest offered against third parties in criminal cases. Lilly raises as many questions as it answers." (Saltzburg, *Declarations against Interest and the Confrontation Clause* (2002) 16 WTR Crim. Just. 51, 57.)

The plurality's decision in *Lilly, supra,* 527 U.S. 116, does cast doubt on the continuing validity of aspects of *People v. Greenberger* (1997) 58 Cal.App.4th 298, 330-331 [68 Cal.Rptr.2d 61], in which the Court of Appeal held that "admission of a statement possessing sufficient indicia of reliability to fall within the hearsay exception of a declaration against penal interest does not deny a defendant the right of confrontation guaranteed by the United States Constitution" and that the determination of whether a statement is trustworthy is entrusted to the discretion of the trial court to be reviewed under an abuse of discretion standard. (Accord, *People v. Wilson* (1993) 17 Cal.App.4th 271 [21 Cal.Rptr.2d 420]; see Evid. Code, § 1230 [declaration against interest as exception to hearsay rule].) According to the plurality in *Lilly,* a declaration against penal interest is not a firmly rooted exception to the hearsay rule and therefore is not admissible on that basis and does not necessarily render a statement trustworthy so as to be admissible (*Lilly, supra,* 527 U.S. at pp. 126-134 [119 S.Ct. at pp. 1895-1899]; see Evid. Code, § 1204 ["[a] statement that is otherwise admissible as hearsay evidence is inadmissible against the defendant in a criminal action if the statement was made . . . by another, under such circumstances that it is inadmissible against the defendant under the Constitution of the United States or the State of California"].) *Lilly* also held that any determination as to whether the out-of-court statement violates the confrontation clause requires an independent review by the appellate court. (*Lilly, supra,* 527 U.S. at pp. 136-137 [119 S.Ct. at pp. 1899-1900].)

(iv) *Statement not admissible under hearsay law*

Arce's recorded statement is hearsay, for "[a]n electronic voice recording has no more sanctity than the oral testimony of a witness recounting the same extrajudicial declarations." (*People v. Sundlee* (1977) 70 Cal.App.3d

477, 483 [138 Cal.Rptr. 834].) ■ A trial witness's deliberate forgetfulness may result in the admission of the statement notwithstanding the hearsay rule or the confrontation clause because the statement could be regarded as a prior inconsistent statement—an exception to the hearsay rule. (*People v. Perez* (2000) 82 Cal.App.4th 760 [98 Cal.Rptr.2d 522]; Evid. Code, § 1235 [inconsistent statements].)

■ Even though Arce's statement might qualify as an exception to the hearsay rule, to allow the statement to be admitted would result in the admission of double hearsay because it relates a statement Schmaus purportedly made. Schmaus's statement was not admissible as an inconsistent statement, for Schmaus did not testify. Thus, *People v. Zapien* (1993) 4 Cal.4th 929, 950-958 [17 Cal.Rptr.2d 122, 846 P.2d 704] (*Zapien*), is not applicable. In that case, the court held that a tape recording of one person's statement about what another person said was admissible under Evidence Code section 1201 (multiple hearsay)[11] and the confrontation clause because both persons testified even though they each denied making the statements. The court held that multiple hearsay testimony was not inadmissible "where each hearsay level constitutes a prior inconsistent statement." (*Zapien*, at pp. 956-957.)

Although Schmaus's statement is a declaration against interest, such a declaration is "not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence." (*Lilly, supra,* 527 U.S. at p. 134 [119 S.Ct. at pp. 1898-1899].) Thus, from a confrontation clause analysis, at least one of the statements—the alleged Schmaus statement—is not admissible, and therefore the law allowing double hearsay is not applicable.

(v) *Trustworthiness*

There is a question as to whether under the *Lilly, supra,* 527 U.S. 116, plurality opinion an out-of-court declaration against interest implicating a defendant can be admitted under a trustworthiness test. In his concurring opinion in *Lilly,* Chief Justice Rehnquist referred to the plurality opinion as imposing a "blanket ban on the government's use of accomplice statements that incriminate a defendant." (*Lilly, supra,* 527 U.S. at p. 147 [119 S.Ct. at p. 1905].) But the plurality denied that its rule "imposes a 'blanket ban on the government's use of [nontestifying] accomplice statements that incriminate a defendant' " (*id.* at p. 134-135, fn. 5 [119 S.Ct. at p. 1899]); rather the

---

[11]"A statement within the scope of an exception to the hearsay rule is not inadmissible on the ground that the evidence of such statement is hearsay evidence if such hearsay evidence consists of one or more statements each of which meets the requirements of an exception to the hearsay rule." (Evid. Code, § 1201.)

government "must satisfy the second prong of the *Ohio* v. *Roberts*, 448 U.S. 56[, *supra*,] [residual trustworthiness] test in order to introduce such statements." (*Ibid.*) The plurality noted, however, that "[i]t is highly unlikely that the presumptive unreliability that attaches to accomplices' confessions that shift or spread blame can be effectively rebutted when the statements are given under conditions that implicate the core concerns of the old ex parte affidavit practice—that is when the government is involved in the statements' production, and when the statements describe past events and have not been subjected to adversarial testing." (*Id.* at p. 137 [119 S.Ct. at p. 1900].)

California courts after *Lilly* have continued to assume that a declarant's statement that is not admissible as "a firmly rooted" exception to the hearsay rule may still be admissible if it "contain[s] particularized guarantees of trustworthiness such that adversarial testing would be expected to add little, if anything, to their reliability. . . ." (*People v. Duke* (1999) 74 Cal.App.4th 23, 29-30 [87 Cal.Rptr.2d 547], citing *Lilly, supra,* 527 U.S. at pp. 124-125 [119 S.Ct. at pp.1894-1895]; see *People v. Wheeler* (2003) 105 Cal.App.4th 1423, 1431 [129 Cal.Rptr.2d 916]; cf. *People v. Castille* (2003) 108 Cal.App.4th 469 [133 Cal.Rptr.2d 489] [involves adoptive admission].) The plurality opinion in *Lilly* did point out, however, that " 'hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of inherent trustworthiness, not by reference to other evidence at trial.' " (*Lilly, supra,* 527 U.S. at p. 138 [119 S.Ct. at p. 1901], quoting *Idaho v. Wright* (1990) 497 U.S. 805, 822 [110 S.Ct. 3139, 3150, 111 L.Ed.2d 638].)

The statement in question is inadmissible even if a trustworthiness test could be applied. We deal here with Arce's out-of-court, non-self-incriminating, recorded statement relating what Schmaus allegedly said. Arce, a convicted criminal, was in custody; he made his statement to authorities; his statement was not self-incriminating; he had a hostile relationship with Schmaus at the time; Arce had a motive to lie; and there was evidence that he was capable of lying. Arce, when he testified, failed to authenticate the tape, and he testified he could not remember the Schmaus statement. The California Supreme Court acknowledged that "the probative value of hearsay evidence decreases with each level of hearsay." (*Zapien, supra,* 4 Cal.4th at p. 956.)

Because of the evidence that undermines the reliability of Arce's statement about what Schmaus said, Schmaus's statement does not possess the necessary " 'particularized guarantee[] of trustworthiness,' [citation] sufficient to satisfy the Confrontation Clause's residual admissibility test" (*Lilly, supra,* 527 U.S. at p. 135 [119 S.Ct. at p. 1899]), even if such a test applied to statements that were not admissible as appropriate hearsay exceptions.

The Attorney General argues the trustworthiness of Schmaus's statement to Arce without reference to considerations of the trustworthiness of Arce's account of what Schmaus may or may not have said. Whether the Schmaus statement was made is just as significant an element of trustworthiness as the potential accuracy of the statement. One of the reasons for the necessity for confrontation of the nontestifying person is to probe whether any statement implicating the defendant was in fact made. Beattie did not have any opportunity to confront Schmaus, who never testified.

Thus, even if the statement's admissibility depends upon its satisfying a trustworthiness test, it could not do so here. United States Supreme Court and California authorities have not approved of the admissibility of an accomplice's out-of-court statements under the circumstances of this case. The admission of the Arce recording referring to Schmaus's alleged statement constituted error.

### (vi) *Harmless error*

Notwithstanding the error in admitting the evidence of Schmaus's statement, the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]; *Lilly, supra,* 527 U.S. at pp. 139-140 [119 S.Ct. at pp. 1901-1902]; *People v. Jenkins* (2000) 22 Cal.4th 900, 1015-1016 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; *People v. Anderson* (1987) 43 Cal.3d 1104, 1128 [240 Cal.Rptr. 585, 742 P.2d 1306]; *People v. Jacobs* (1987) 195 Cal.App.3d 1636, 1652 [241 Cal.Rptr. 550].) ██ "[I]f the properly admitted evidence is overwhelming and the incriminating extrajudicial statement is merely cumulative of other direct evidence, the error will be deemed harmless." (*People v. Anderson, supra,* 43 Cal.3d at p. 1129; see also *People v. Jacobs, supra,* 195 Cal.App.3d at p. 1652 [admission of statement was harmless because the jury had to decide the critical issue of identity on the basis of evidence, of which there was "an abundance"].)

██ Evidence of Schmaus's purported statement that he, Glenn, and "another guy" killed Hampton was merely cumulative of Glenn's express identification of Beattie. Glenn identified Beattie as one of the men in cell 9 who participated in killing Hampton. Glenn's testimony was sufficiently corroborated by Beattie's palm print in Hampton's cell and by Deputy Rojas's testimony that Beattie asked for a cell check on the night of the murder. There is no evidence in the record that any official made an offer to Glenn before he gave his initial statement incriminating defendants. Once Glenn's testimony was corroborated, the evidence of Beattie's guilt was overwhelming. (See generally *Arizona v. Fulminante* (1991) 499 U.S. 279, 306-307 [111 S.Ct. 1246, 1262-1264, 113 L.Ed.2d 302]; *Olden v. Kentucky* (1988) 488 U.S. 227, 232-233 [109 S.Ct. 480, 483-484, 102 L.Ed.2d 513].)

Beattie, however, cites as evidence of prejudicial error the jury's requests during deliberations to listen to or to read Arce's statement and to have read the testimony of Glenn and Deputy Rojas in reference to Beattie. That the jury wanted to review Arce's statements does not indicate they wanted to do so in the context of Beattie, as Arce's statement also implicated Schmaus. Given the evidence of Beattie's guilt as established by Glenn's corroborated testimony, the jury's additional request to review evidence relating to Beattie does not show sufficient prejudice. The same considerations of harmless error relating to the confrontation issue—particularly the testimony of Glenn that was sufficiently corroborated—apply to the other defendant, Black, who has joined in this contention.

C.-I.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

III.   *Black's Contentions**

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

DISPOSITION

The judgment is affirmed in its entirety as to Jason Schmaus. The judgment as to Michael Beattie is modified to strike two of the life without possibility of parole sentences and is otherwise affirmed. The judgment as to Danny Black is modified to strike two of the life-without-possibility-of-parole sentences and is otherwise affirmed. The clerk of the superior court is directed to prepare amended abstracts of judgment reflecting these modifications and to forward copies to the Department of Corrections.

Turner, P. J., and Armstrong, J., concurred.

A petition for a rehearing was denied July 2, 2003, and appellants' petition for review by the Supreme Court was denied September 24, 2003. Kennard, J., was of the opinion that the petition should be granted.

---

*See footnote, *ante*, page 846.