[No. B192952. Second Dist., Div. Seven. Jan. 7, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
KEVIN JEFFERSON et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION***]**

---

*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts III through VI.

COUNSEL

Lynda A. Romero, under appointment by the Court of Appeal, for Defendant and Appellant Kevin Jefferson.

Neil Rosenbaum, under appointment by the Court of Appeal, for Defendant and Appellant Curtis Staten.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Stephanie C. Brenan, Joseph P. Lee and Ana R. Duarte, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**WILEY, J.**[*]—This case is about a retaliatory driveby shooting. A jury convicted appellants Kevin Jefferson and Curtis Staten of the first degree murder of one person and of the attempted murder of another. There was no reversible error. We modify the abstracts of judgment to correct uncontested technical errors. As so modified, we affirm.

I

Tazmania Bernard was a member of the Compton Fruit Town Piru street gang. Someone shot him to death on July 30, 2005. Fellow gang members blamed Bernard's murder on a rival Compton gang called the Varrio Tortilla Flats. Retaliation for Bernard's death was the motive for the deadly acts that followed.

A

The next day Anthony Staniforth and his fiancée Dalinda Penaloza returned from Universal City Walk. Staniforth and Penaloza had nothing to do with gangs. It was Staniforth's 24th birthday. Staniforth and Penaloza sat in his Jeep near her place around 11:00 at night, talking about their plans to marry. Penaloza was in the passenger seat. Staniforth was in the driver's seat.

Anyone driving by Staniforth could see his arm tattoos, on account of his short sleeves that summer night. Penaloza identified the tattoos. Penaloza said Staniforth had no gang tattoos and was not in a gang. One of his tattoos was

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

"V.H.," however, which stood for Staniforth's favorite band Van Halen. The coroner later opined Staniforth's tattoo could have been "V.F." instead of V.H. Defense counsel suggested that a V.F. tattoo on Staniforth might stand for "Varrio Flats." The suggestion was an alleged variant of Compton Varrio Tortilla Flats, the rival gang supposedly responsible for shooting Tazmania Bernard. So Staniforth may have died simply due to a mixup over a Van Halen tattoo.

A white Suburban drove by. It stopped about one or two car lengths ahead. Penaloza heard the driver put it in reverse. The Suburban backed up to Staniforth's Jeep. The front passenger window was part way down. Penaloza thought the people were going to ask for an address or something, but they never spoke. Instead, the front passenger bent over and came up with something silver. Penaloza saw a handgun. The man started shooting at Staniforth. Penaloza wanted to scream but could not. She heard at least 10 shots. Other evidence showed at least 15 shots. Penaloza saw only one gun but thought from the sounds there had to be more. The coroner recovered seven bullet fragments from Staniforth's body. Three shots were fatal. Two severed his abdominal aortic artery. The third tore through his skull and sprayed brain matter over the Jeep interior. Only broken glass hit Penaloza. She never got a good look at any shooter.

Sergeant John Corina was the investigating officer on this case. At the crime scene Corina found Staniforth still belted into the Jeep's driver seat. Corina located broken glass on the street nearby. The glass had factory tinting and apparently was from the Suburban.

A gun expert found a fired cartridge case at the scene. It was 762 by 39 millimeters and had been shot from either an AK-47 rifle or an SKS automatic rifle. The expert recovered several slugs from inside the Jeep. The bullets were .38- or .357-caliber, a common revolver caliber. Several bullets also hit the house behind Staniforth's Jeep. One bullet penetrated the front window and lodged in a bedroom wall.

Corina began searching for a white Suburban with a broken tinted window. He found a matching Suburban in Fruit Town Piru gang territory. The Suburban belonged to appellant Curtis Staten.

Officers impounded the Suburban. There were three fired 762- by 39- millimeter casings between the seat back and seat bottom of the Suburban's right rear passenger seat. The gun expert matched these three cartridge casings with the single casing from the murder scene. The same gun had fired all four. The expert tried but failed to gather gunshot residue from the Suburban.

## B

Four days after the shooting, officers arrested appellants Curtis Staten and Kevin Jefferson. Corina and his partner talked to Staten for about 20 minutes at the police station. The officers mentioned some evidence they had. They told Staten they thought the shooting was retaliation for the shooting death the day before of Tazmania Bernard. Staten was being held for murder, they said. The officers told Staten—falsely—that they had found gunshot residue in his Suburban. They told Staten they thought he was the driver but not a shooter. The officers also said they had talked to Staten's cousin. That cousin's name, "Smurf," came into the conversation. The officers read Staten his *Miranda* (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]) rights, which Staten refused to waive. The officers put Staten in a holding cell and left.

The officers then spoke to Jefferson. They showed him pictures of members of the Fruit Town Piru gang they thought were involved. The officers identified each by moniker. One picture was of a Ricky Smith. The officers told Jefferson that at least three people were involved and that Jefferson had been one of the shooters. They speculated the other shooter was a gang member called "O.T." The officers lied that they found Jefferson's fingerprints inside the Suburban as well as on bullets recovered from it.

They asked Jefferson how he knew Staten. Staten belonged to the Crips, while Jefferson was in the Bloods. Jefferson said he was dating Staten's cousin and that Staten and his family had been living in the neighborhood for ages. For about 20 minutes the officers went over their evidence with Jefferson. Then they read him his *Miranda* rights. Jefferson refused to waive his rights or to speak anymore. The officers put Jefferson in the cell with Staten and left.

## C

This cell was bugged. As Corina had hoped, Staten and Jefferson started talking about the shooting. Both made incriminating statements. Many comments revealed their damning knowledge of the crime's details. At their joint trial, the jury heard their taped conversation. The tape lasted over an hour. This tape is an issue in this appeal. We do not quote it verbatim, but some detail will give a sense of Staten and Jefferson's long and unguarded exchange.

On the tape, Staten and Jefferson said someone must have "snitched" to the police. They were shocked to learn police knew the gang members' monikers. They also were surprised to learn how much evidence the police had already

gathered against them. They wondered if someone was talking, and whether it was Staten's cousin Smurf.

Staten understood how police could link him to the shooting. His Suburban and its tinted glass from the scene made that connection. But the two could not see how police knew to arrest Jefferson. That seemed to confirm a snitch. Staten told Jefferson, "That's fucking scandalous man. . . . [I]f, however this shit go, . . . whether I get 10 years I can deal, 8 years, I can deal, 30 years I can deal, . . . all I'm going to say is this, look I'm not ever, ever, fittin to do no shit like that again, and when I do you can believe me . . . I'm only going with only one or two mother fuckers. I'm not going with no car load. Man, I'm telling you man, I guarantee you. . . . Where we, where mother fuckers fucked up at, I don't know who it was, but mother fuckers talking to[o] much of what mother fuckers done. . . ." Jefferson said "Yeah." Staten continued that "[o]nly person that should have really know was us three, you see what I'm saying? Mother fuckers come back, bragging about it, talking about it, and then no telling what [Smith] and them told, you see what I'm saying? Cause you know they done told somebody."

Jefferson reminded Staten three "hot" "K's," meaning AK-47's, were then at Smith's house. Jefferson worried whether Smith would get rid of the guns, would move them to safety, or would lose his house if police found hot guns there. Jefferson wished he could warn the others to move the guns. Jefferson also expressed concern about whether the police would find his bag of .357-caliber bullets. Staten asked Jefferson if he put the bullets in the glove compartment of the Suburban. Jefferson said no. Jefferson said he meant a bag of .357-caliber unfired bullets he kept at his house. Staten responded, "I thought maybe you was talking about the bullets from the bust." Corina testified that "bullets from the *bust*" meant "bullets from the *shooting*." Jefferson assured Staten he meant unfired bullets. Jefferson said he had not put shell casings in the Suburban's glove compartment.

Staten and Jefferson each had thought about moving into a motel or getting away for a while. They discussed these ideas. Staten "wasn't expecting these mother fuckers to put the smash down that quick." It all had been "within four days." Jefferson concurred: "This shit is unbelievable." They began to worry anew about a snitch. Staten said the police "told me this, I don't know how true it is, but they said it's going to be hard for them to try and really convict us because dude is dead and the home girl already said she didn't really see nothing, don't really know nothing. Now all of a sudden they know every fucking thing."

The two discussed the Suburban. Staten said that due to the "ballistics all of a sudden they know that was the truck used." Jefferson replied that,

"[d]amn, you should have left that mother fucker parked and got the window fixed though." Staten criticized Jefferson's suggestion: "Just think about it. . . . If I would have done that we would probably be in a worse situation. . . . If I wouldn't have gone and did nothing to that car until I got the window fixed, . . . there still would be shells in there . . . ."

Staten told Jefferson the police said murder victim Staniforth was from South Gate and was not a gang member. Staten said, "Okay, he from South Gate, but they trying to say he didn't bang. But I know, I've seen tattoos on this mother fucker." Staten continued, "Dog, I don't know what to do now. All I know is now I feel good cause I know they ain't find no shell casings in that mother fucker."

The jury had the tape transcript, which included this exchange:

"Jefferson: I ain't worried about it. We're gonna beat that shit.

"Staten: Huh?

"Jefferson: Gonna beat that shit.

"Staten: Why?

"Jefferson: Beat that hot one. They ain't, they ain't got enough to go on cause they got have some suspicion of evidence to be booking me on a hot one. Unless them mother fuckers be coming to court and be snitching."

Staten told Jefferson "I refuse to keep putting my life on the line just for your own to rat you out man."

Staten also said police could not have found their fingerprints. "See, I know he lying when he said fingerprint. Dog, mother fuckers had gloves on from the *gate*," which according to Corina meant "from the *beginning of the crime*." Corina said police did not know the shooters in the Suburban had used gloves.

Staten's aunt later visited him. The police microphone also captured this conversation. The prosecution played a small portion of this exchange for the jury. Staten told his aunt, "they know. They got his name all in the report. They got his name, the other dude, they know where all the stuff come from and everything. They know what all it's about." Staten's aunt was dismayed. Staten assured her, "Yep. They know everything auntie. From, like if they was there. They, so somebody, somebody that's close told them something."

## D

Detective Q. Rodriguez testified as a gang expert. He investigated violent gang crimes in Compton. He had been a police officer for 17 years and had spent nine years in the gang unit.

Rodriguez testified Fruit Town Piru is a Blood gang located in the middle of Compton. The gang claimed some 290 members. Fruit Town Piru's territory had once overlapped with the Compton Tortilla Flats gang's territory. For this reason the two gangs were "involved in standing wars" with each other. Rodriguez identified Staten as a member of the Palmer Block Crips whose gang moniker is "To Jo." Jefferson is a member of Fruit Town Piru whose gang moniker is "killa Kev" or "killer Kev." Jefferson had a gun tattoo on his arm. Rodriguez noted Crips and Bloods are traditional rivals. For this reason he thought it unusual for Staten and Jefferson to associate. The expert was familiar with Fruit Town Piru gang member Gregory Williams, known as O.T. He also knew Smith to be a Fruit Town Piru gang member.

Rodriguez testified that gaining respect is important for criminal street gangs. Gangs, he claimed, gain respect by committing violent acts or other crimes. The more violent the act the more respect a member expects to earn from fellow members, the public, and law enforcement. Respect equals status, both for the gang as a whole and for the individual committing the violent or criminal act. The expert said it is immaterial whether the victim of an assault is a rival gang member because status and respect flow from the act itself. The gang expert also interpreted some terms Jefferson and Staten used on the tape.

This gang expert opined the shooting in this case helped the Fruit Town Piru street gang. Rodriguez testified the shooting was "an obvious retaliation for the murder of Tazmania Bernard" the previous day. Fruit Town Piru gang members thought rival gang Tortilla Flats was responsible for that murder. Fruit Town Piru gang members drove to the Tortilla Flats area, saw a Hispanic-looking person, took him for a gang member, and shot him to death.

## E

An information charged Jefferson and Staten in count one with Staniforth's murder. (Pen. Code, § 187, subd. (a); further statutory references are to the Penal Code unless otherwise noted.) In count two, the information charged Jefferson and Staten with the willful, deliberate, and premeditated attempted murder of Penaloza. (§§ 664, 187, subd. (a).) As to both counts, the information alleged a principal personally and intentionally discharged a firearm causing great bodily injury or death. (§ 12022.53, subds. (b), (c), (d), (e)(1).)

It further alleged the crimes were committed for the benefit of, at the direction of, and in association with a criminal street gang. (§ 186.22, subd. (b)(1)(A).) As to Jefferson only, the information alleged he personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subds. (b), (c), (d)) and that he had served a prior prison term (§ 667.5, subd. (b)).

Jefferson and Staten's first jury hung. On retrial, the prosecution spent more time explaining and emphasizing the tape. The second jury found both Jefferson and Staten guilty of murder in count one and fixed the degree of murder at first degree. That jury also found both men guilty in count two of willful, deliberate, and premeditated attempted murder. The jury found true the allegation that a principal personally and intentionally discharged a firearm causing death. The jury likewise found the gang enhancement allegation to be true. As to Jefferson, the jury found not true the allegations he personally and intentionally discharged a firearm causing death.

In a bifurcated proceeding, the trial court found true the allegation Jefferson had served a prior prison term. The trial court sentenced Jefferson to an aggregate term of 76 years to life in state prison with the possibility of parole. Staten's overall sentence was 75 years to life in state prison with the possibility of parole.

Jefferson and Staten appeal from the judgments of conviction.

## II

First we address the tape issues. When Jefferson and Staten stopped talking to police, police put them in a bugged cell hoping they would talk to each other. Thinking they were alone, Jefferson and Staten did. The jury heard that tape, as well as a part of another tape of Staten talking to his aunt.

Jefferson and Staten say it was constitutional error to admit the tape of their conversation. They claim its admission violated due process, their Fifth Amendment rights, and their rights of confrontation and cross-examination under the Sixth Amendment. Jefferson also argues admission of Staten's recorded statements to his aunt violated Jefferson's Sixth Amendment rights of confrontation and cross-examination under *Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620] and *People v. Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265]. Jefferson points out Staten invoked his right not to testify at trial and thus could not be cross-examined about those statements. These claims all lack merit.

## A

In *Miranda*, the United States Supreme Court sought to protect a defendant's Fifth and Fourteenth Amendment privilege against compulsory self-incrimination during custodial interrogation. The *Miranda* court outlined procedural safeguards for this purpose, including the familiar *Miranda* warnings. (*Miranda v. Arizona, supra,* 384 U.S. at pp. 473–474, 479.) When suspects invoke their *Miranda* rights, police must respect those decisions to remain silent. (*Id.* at p. 474.)

The officers properly gave Jefferson and Staten their *Miranda* rights. Jefferson and Staten both invoked these rights. Jefferson and Staten were "in custody" in the jail cell. The issue here thus is whether Jefferson and Staten were "interrogated" in violation of their *Miranda* rights because, unbeknownst to them, police got them on tape.

Jefferson and Staten correctly observe that "interrogation" is not limited to direct questioning by the police. There also is "interrogation" when police subject a person in custody to its "functional equivalent." In the context of "custodial interrogation," the functional equivalent of express questioning includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301 [64 L.Ed.2d 297, 100 S.Ct. 1682], fn. omitted.) In making this determination, the focus is on "the perceptions of the suspect, rather than the intent of the police." (*Ibid.*)

Jefferson and Staten acknowledge their situation was not the paradigmatic *Miranda* violation, where the suspect invokes but the police keep asking questions anyway. Jefferson and Staten instead argue the officers knew that placing them together in a microphoned cell was "reasonably likely to elicit an incriminating response." This form of "interrogation," they say, procured their statements in violation of their Fifth Amendment and *Miranda* rights. Jefferson and Staten conclude the tape was inadmissible at trial.

This is incorrect. Settled law shows that Jefferson and Staten were not "interrogated." "Interrogation" requires "a measure of compulsion above and beyond that inherent in custody itself." (*Rhode Island v. Innis, supra,* 446 U.S. at p. 300.) That compulsion is missing when a suspect speaks freely to someone the suspect thinks is a fellow cellmate. "When a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere is lacking." (*Illinois v. Perkins* (1990) 496 U.S. 292, 296, 300 [110 L.Ed.2d 243, 110 S.Ct. 2394] [undercover law enforcement officer posing as a fellow inmate need not provide *Miranda* warnings before asking questions likely to

elicit an incriminating response]; see also *Kuhlmann v. Wilson* (1986) 477 U.S. 436, 459 [91 L.Ed.2d 364, 106 S.Ct. 2616] [to establish a 6th Amend. violation of the right to counsel, a defendant "must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks"]; *People v. Williams* (1988) 44 Cal.3d 1127, 1141–1142 [245 Cal.Rptr. 635, 751 P.2d 901] [no *Miranda* violation where jailhouse informant acted as mere listening post].)

■ Jefferson and Staten were more than just fellow cellmates. They were friends and neighbors. They spoke freely—too freely, they now realize. From their perspective, the problem was the opposite of compulsion. They were candid because they thought no one else was listening, not because they were getting the third degree. It was, as the officers hoped, a spontaneous and natural conversation between friends with a dilemma on their minds. These statements were voluntary. " 'Volunteered statements of any kind are not barred by the Fifth Amendment . . . .' " (*Rhode Island v. Innis, supra,* 446 U.S. at p. 300.)

■ It does not matter that Jefferson and Staten were in jail and not a restaurant or some other place of leisurely liberty. The Supreme Court in *Perkins v. Illinois, supra,* 496 U.S. at page 297, wrote that "*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust . . . ." There are many applications of this rule. For example, in *People v. Mayfield* (1997) 14 Cal.4th 668 [60 Cal.Rptr.2d 1, 928 P.2d 485] the defendant invoked his *Miranda* rights but asked to speak with his father. Officers secretly taped the defendant's incriminating statements at that meeting. (*People v. Mayfield, supra,* 14 Cal.4th at p. 757.) The Supreme Court upheld the practice, reciting that " 'it is clear that defendant's conversations with his own visitors are not the constitutional equivalent of police interrogation.' " (*Id.* at p. 758.) If conversations with undercover police do not trigger *Miranda* concerns, reasoned our high court, then a conversation with your father is even less of a problem. (*Id.* at p. 758.)

The situation was similar in *People v. Thornton* (2007) 41 Cal.4th 391 [61 Cal.Rptr.3d 461, 161 P.3d 3]. Defendant Thornton invoked *Miranda.* Police officers arranged for his grandmother to visit him in jail. Police taped their conversation and the prosecutor introduced the incriminating statements at trial. The Supreme Court rejected Thornton's claim that this was custodial interrogation. Conversations with your " ' "own visitors are not the constitutional equivalent of police interrogation." ' " (*Id.* at p. 433.)

Conversations with undercover police agents posing as fellow cellmates do not implicate Fifth Amendment *Miranda* concerns. Much less do conversations with a cellmate who is your neighbor and friend. There was no interrogation. There was no *Miranda* violation.

## B

The trial court admitted the tape as Jefferson's and Staten's admissions and adoptive admissions. In this court, Jefferson and Staten next argue that the trial court thereby violated their Sixth Amendment rights. "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." (U.S. Const., 6th Amend.) On retrial before a different trial judge unfamiliar with the first court's rulings, Jefferson and Staten failed to renew this specific constitutional objection. Assuming without deciding the issue is preserved for appellate review (see *People v. Jurado* (2006) 38 Cal.4th 72, 117 [41 Cal.Rptr.3d 319, 131 P.3d 400]; *People v. Champion* (1995) 9 Cal.4th 879, 908, fn. 6 [39 Cal.Rptr.2d 547, 891 P.2d 93]), the claim is without merit.

■ The Supreme Court of the United States in *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] set out that the Sixth Amendment "applies to '*witnesses*' against the accused—in other words, *those who 'bear testimony.'* . . . 'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' . . . An accuser who makes a *formal statement to government officers* bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." (541 U.S. at p. 51, citations omitted, italics added.) For this reason, the Sixth Amendment applies only to "testimonial evidence." (541 U.S. at p. 68.) The Sixth Amendment does not apply to the tape of Staten and Jefferson because their statements were not "formal statement[s] to government officers" and thus were not "testimonial."

Jefferson and Staten made no "formal statement to government officers" because they never intended to speak to anyone connected with the government. This was no interrogation. No official with an agenda was asking questions and taking notes. No government player was inserting veiled threats or subtle cues to get the goods on these two. Jefferson and Staten were friends. They thought the police were gone and they could talk freely. On their own, they were trying to size up a frightening and perplexing situation. The last thing Jefferson and Staten thought they were doing was "testifying." Their conversation was not "testimonial" because it was not "a formal statement to government officers." (See also *Davis v. Washington* (2006) 547 U.S. 813, 830, fn. 5 [165 L.Ed.2d 224, 126 S.Ct. 2266, 2278, fn. 5] ["formality is indeed essential to testimonial utterance"]; cf. *Crawford v. Washington, supra,* 541 U.S. at p. 51 ["An off-hand, overheard remark . . . bears little resemblance to the civil-law abuses the Confrontation Clause targeted."].)

■ Beyond this language about "a formal statement to government officers," the *Crawford* court offered two other complementary definitions of

"testimonial statements." The same results obtain with each. The second *Crawford* definition of "testimonial statements" is " 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.' " (*Crawford v. Washington, supra*, 541 U.S. at pp. 51–52; see also *People v. Cage* (2007) 40 Cal.4th 965, 984 [56 Cal.Rptr.3d 789, 155 P.3d 205] [to be testimonial, a statement "must have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony"].) There was nothing formalized about Jefferson and Staten's meandering and profane conversation. The government did not direct or organize the talking. The police hid the mikes, rolled the tape, and hoped to trick Staten and Jefferson into saying what was on their minds. How and what Staten and Jefferson said was entirely up to Staten and Jefferson. There was no "structured police questioning" (*Crawford v. Washington, supra*, 541 U.S. at p. 53, fn. 4) and no *Crawford* problem. (Cf. *Davis v. Washington, supra*, 547 U.S. at pp. 826–827 [126 S.Ct. at p. 2276] [statements in response to 911 operator's questions were not testimonial when questions were not designed primarily to prove some past fact]; *People v. Cage, supra*, 40 Cal.4th at p. 984 [to be testimonial, statements must be *given* and taken primarily for the purpose ascribed to testimony: to establish or prove some past fact for possible use in a criminal trial]; *People v. Geier* (2007) 41 Cal.4th 555, 605 [61 Cal.Rptr.3d 580, 161 P.3d 104] ["it is the 'involvement of government officers in the production of testimonial evidence' that implicates confrontation clause concerns"].)

 The third *Crawford* definition of a "testimonial statement" was " 'statements that were made under circumstances which would lead an objective *witness* reasonably to believe that the statement would be available for use at a later trial.' " (*Crawford v. Washington, supra*, 541 U.S. at p. 52, italics added.) Here the proper focus is on an objective person in Jefferson and Staten's situation because they are the speakers whose words the jury later heard. Jefferson and Staten would be the witnesses who would " 'bear testimony.' " (*Id.* at p. 51; see also *People v. Cage, supra*, 40 Cal.4th at p. 984 ["the primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the *participants in the conversation*" (italics added)].) The circumstances would not lead an objective person in Jefferson's and Staten's shoes to believe their conversation would be available for use at a later trial. The statements would not be available because Jefferson and Staten thought their conversation was secret. They trusted each other to keep silent or else they would not have talked so candidly. And they thought no one else could hear. When people speak confidentially, their trusting expectation of confidentiality is the *opposite* of expecting that a trial will publicize their private words. Once again, there is no *Crawford* problem.

This result makes sense. The *Crawford* court wrote about the prosecutorial abuse that the Sixth Amendment aimed to combat. "Involvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse—a fact borne out time and again throughout a history with which the Framers were keenly familiar." (*Crawford v. Washington, supra*, 541 U.S. at p. 56, fn. 7; see also *id.* at p. 51 ["flagrant inquisitorial practices"].) Jefferson and Staten were not like Cobham under duress. (See *id.* at pp. 44, 51, 52, 62 [using hearsay of Lord Cobham in 1603 trial of Sir Walter Raleigh as epitome of the prosecutorial abuse that 6th Amend. sought to prevent].) Jefferson and Staten were friends who felt at liberty to speak freely. No prosecutorial abuse or government coercion prompted their damning words. The Sixth Amendment did not apply to this recording.

## C

Jefferson also argues a different Sixth Amendment point. He says the tape of Staten and his aunt violated his Sixth Amendment rights of confrontation and cross-examination. This claim fails. After the extremely damaging tape of the long conversation between Jefferson and Staten, any error from the brief tape of Staten's comments to his aunt was harmless.

Recall that Staten's statement to his aunt referred to "the other dude" whose "name [was] all in the report." Other evidence suggested three people probably had been involved in the shooting: Jefferson, Staten, and someone named O.T.

The pertinent doctrine is the *Aranda/Bruton* line of cases. These cases apply when there is more than one defendant at a single trial. Suppose there are two defendants. Call them A and B. Suppose also A confesses to the crime after arrest but then decides not to testify at trial. If A's confession incriminates not just A but also B, then it is *Aranda/Bruton* error to tell the jury what A said. This evidence would violate B's Sixth Amendment right of confrontation, because A's decision to remain silent at trial deprives B of the power to confront and cross-examine A. (See *Bruton v. United States, supra*, 391 U.S. 123, 127–128; *People v. Aranda, supra*, 63 Cal.2d 518, 530.)

One standard way to avoid *Aranda/Bruton* error is redaction. If the court redacts A's confession "to eliminate not only [B's] name, but any reference to his or her existence," then the prosecution may use A's redacted confession in a trial where A and B are codefendants. (*Richardson v. Marsh* (1987) 481 U.S. 200, 211 [95 L.Ed.2d 176, 107 S.Ct. 1702].) This is proper even though A's redacted confession may incriminate B when considered in conjunction with other evidence against B. (*Id.* at p. 208.)

Our Supreme Court provided guidance for reviewing redacted confessions in *People v. Fletcher* (1996) 13 Cal.4th 451, 468–469 [53 Cal.Rptr.2d 572, 917 P.2d 187]. Courts must judge the efficacy of this type of redaction case by case and in light of other evidence at trial. The redaction will be insufficient "if, despite the editing, reasonable jurors could not avoid drawing the inference that the defendant was the coparticipant designated in the confession . . . ." (*Id.* at p. 456.) By contrast, "a confession that is redacted to substitute pronouns or similar neutral and nonidentifying terms for the name of a codefendant will be sufficient if the codefendant was just one of a *large group* of individuals any one of whom could equally well have been the coparticipant mentioned in the confession." (*Id.* at p. 466, italics added.)

Here, the group of coparticipants mentioned in the confession numbered only three: Jefferson, Staten, and O.T. A group of three is not a "large group." It is barely larger than the smallest possible group. So this "large group" exception would not seem to apply here. The other possibility is the "other dude" in Staten's statement was a direct reference to Jefferson. If so, it would be error to admit this portion of Staten's statement.

Nevertheless, any error here was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]; *People v. Cage, supra,* 40 Cal.4th 965, 991–992 [applying *Chapman*'s harmless error analysis to 6th Amend. error].) It was proper to admit Jefferson's own recorded statements and his own adoptive admissions from his talk with Staten. This proper evidence amply established Jefferson's guilt. These statements described the shooting victim, for example, as well as the guns and the Suburban used in the shooting. The overwhelming proof from all the proper evidence means any error in admitting Staten's statement about the "other dude" was harmless beyond a reasonable doubt. (See *People v. Schmaus* (2003) 109 Cal.App.4th 846, 859 [135 Cal.Rptr.2d 521] [error in admitting statement implicating a nontestifying defendant was harmless because it was cumulative of other properly admitted evidence overwhelmingly proving guilt].)

## III–VI*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## VII

In Staten's case, the cause is remanded to the superior court with directions to prepare a new abstract of judgment striking the one-year term imposed

---

*See footnote, *ante,* page 830.

under section 667.5, subdivision (b) and imposing an aggregate court security fee of $40 for his two convictions, and to forward the modified judgment to the corrections officials. As so modified, the judgment as to Staten is affirmed.

In Jefferson's case, the cause is remanded with directions to the superior court to prepare a new abstract of judgment imposing an aggregate court security fee of $40 for his two convictions and to forward the modified judgment to the corrections officials. As so modified, the judgment as to Jefferson is affirmed.

Perluss, P. J., and Zelon, J., concurred.

Petitions for a rehearing were denied January 23, 2008, and appellants' petition for review by the Supreme Court was denied April 16, 2008, S160691. George, C. J., did not participate therein.