**Paul Jimmy REA, Petitioner,**

v.

**Robert GOWER, Warden, Respondent.**

**Caase No. CV 12–2241–ODW (JPR).**

United States District Court, C.D. California.

Signed Sept. 19, 2014.

Paul Jimmy Rea, Corcoran, CA, pro se.

Yun K. Lee, Office of Attorney General of California, Los Angeles, CA, for Respondent.

## ORDER ACCEPTING FINDINGS AND RECOMMENDATIONS OF U.S. MAGISTRATE JUDGE

OTIS D. WRIGHT, II, District Judge.

Pursuant to 28 U.S.C. § 636, the Court has reviewed the Petition, records on file, and Report and Recommendation of the U.S. Magistrate Judge. No objections to the Report and Recommendation have been filed, even though Petitioner was granted an extension of time within which to do so. The Court accepts the findings and recommendations of the Magistrate Judge.

IT THEREFORE IS ORDERED that the Petition is denied, Petitioner's request for an evidentiary hearing is denied, and Judgment be entered dismissing this action with prejudice.

PAUL JIMMY REA,

Petitioner,

vs.

STU SHERMAN, Warden,[1]

Respondent.

---

1. Stu Sherman, warden of California Substance Abuse Treatment Facility and State

## REPORT AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE

JEAN ROSENBLUTH, United States Magistrate Judge.

This Report and Recommendation is submitted to the Honorable Otis D. Wright, II, U.S. District Judge, under 28 U.S.C. § 636 and General Order 05–07 of the U.S. District Court for the Central District of California.

## PROCEEDINGS

On March 16, 2012, Petitioner filed a Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254, raising three claims. On March 22, 2012, the Court issued an Order to Show Cause why the Petition should not be dismissed because ground two was unexhausted. On November 19, 2012, Petitioner requested that ground two be dismissed and moved to stay this action while he exhausted the claim in state court. On November 21, 2012, the Court granted Petitioner's motion, dismissed ground two, and stayed this case pending Petitioner's exhaustion of his state remedies. On April 29, 2013, Petitioner moved for leave to amend ground two back into his Petition, which the District Judge denied on October 1. On October 7, 2013, the Court lifted the stay and ordered Respondent to file a response to the Petition's remaining claims. On February 18, 2014, after three extensions of time, Respondent filed an Answer with an attached memorandum of points and authorities. On May 5, 2014, after two extensions of time, Petitioner filed a Reply.

For the reasons discussed below, the Court recommends that judgment be entered denying the Petition, denying Petitioner's request for an evidentiary hearing, and dismissing this action with prejudice.

## PETITIONER'S CLAIMS [2]

I. The trial court's admission into evidence of the victim's hearsay statement that he feared Petitioner violated the Confrontation Clause and deprived Petitioner of due process and a fair trial. (Pet. at 5, 48–55.) [3]

II. The trial court's refusal to exclude contaminated DNA evidence deprived Petitioner of due process. (*Id.* at 6, 56–61.)

## BACKGROUND

On October 8, 2009, Petitioner was convicted by a Los Angeles County Superior Court jury of (1) evading a peace officer causing serious bodily injury, in violation of California Vehicle Code section 2800.3(a), (2) resisting a peace officer, in violation of California Penal Code section 148.10(a), (3) first-degree murder, in violation of Penal Code section 187(a), and (4) unlawful possession of a firearm, in violation of Penal Code section 12021(a)(1). (Lodged Doc. I, 1 Clerk's Tr. at 205–06.) The jury found true that Petitioner had used a firearm, in violation of section 12022.53(b), and had personally and intentionally discharged a firearm, in violation of section 12022.53(c). (*Id.* at 172.) On January 5, 2009, the court sentenced him

---

Prison in Corcoran, where Petitioner is currently housed, is substituted in under Federal Rule of Civil Procedure 25(d) as the sole respondent. *See* R. 2, Rs. Governing § 2254 Cases in U.S. Dist. Cts.

**2.** The Court has renumbered Petitioner's claims given its denial of Petitioner's motion for leave to amend ground two back into the Petition.

**3.** Because the pages in the Petition are not sequentially numbered, the Court has used the numbering from its Case Management/Electronic Case Filing system.

to 50 years to life in state prison plus eight years eight months. (Lodged Doc. J, 5 Rep.'s Tr. at 2401, 2404.)

Petitioner appealed, raising the remaining claims in his Petition (Lodged Doc. K); the California Court of Appeal affirmed the judgment (Lodged Doc. B). Petitioner thereafter filed a petition for review with the California Supreme Court, raising the same claims (Lodged Doc. C); on October 20, 2010, the supreme court denied review (Lodged Doc. D). On January 14, 2011, Petitioner filed a petition for writ of certiorari in the U.S. Supreme Court, which denied certiorari on March 7. (Lodged Doc. 1.)

Petitioner filed a round of habeas petitions in the state courts in order to exhaust an ineffective-assistance-of-counsel claim.[4] (*See* Lodged Docs. 2, E, G.) At each level, the habeas petition was denied. (*See* Lodged Docs. 3, F, H.) He did not raise the Petition's two exhausted claims in those petitions.

## SUMMARY OF THE EVIDENCE

The factual summary set forth in a state appellate-court opinion is entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1). *See Thompson v. Runnels,* 705 F.3d 1089, 1091–92 (9th Cir.), *cert. denied,* —— U.S. ——, 134 S.Ct. 234, 187 L.Ed.2d 174 (2013); *but see Murray v. Schriro,* 745 F.3d 984, 1001 (9th Cir.2014) (discussing "state of confusion" in circuit's law concerning interplay of § 2254(d)(2) and (e)(1)). Because Petitioner does not challenge the sufficiency of the evidence, the Court adopts the following statement of facts from the California Court of Appeal opinion as a fair and accurate summary of the evidence presented at trial.

The Court has nonetheless independently reviewed the state-court record.

On March 3, 2007, Vitorio Pratti and his girlfriend Nancy Sanchez were staying at the home of their friend, Armida Parra. Parra's boyfriend Ricardo Tapia was also at the home, as was Parra's five-year-old son. The group ordered food from a local restaurant. Sanchez was sleeping, but at around 9:00 p.m. she awoke when the food was delivered. She began eating in the living room while Pratti sat nearby. Parra and Tapia were in the kitchen. [Petitioner] arrived at the house. [Petitioner] and Pratti were both members of the Quiet Village gang, and had been good friends. However, when [Petitioner] arrived at the house, he and Pratti did not speak to each other. [Petitioner] entered the house through a back door that led into the kitchen. [Petitioner] spoke with Parra and Tapia in the kitchen. Parra was upset because the food she ordered had not been prepared as she wished. Tapia walked out of the house through the back door and Parra followed. Pratti went into the kitchen.

While Tapia and Parra were outside and Sanchez was in the living room, all three heard gunshots. Sanchez heard one shot, a pause, and three shots followed. Parra was on her way back into the house when she heard one shot, then two more. Parra ran to the house and saw [Petitioner] standing at the back door. Parra asked, "What the fuck are you doing?" [Petitioner] was holding a small gun in his right hand and looked confused. Parra ran past [Petitioner] to check on her son. Tapia was still outside when he also heard one shot, a pause, and two shots. He ran to the house and saw [Petitioner] when he

---

4. Petitioner's ineffective-assistance-of-counsel claim was the subject of the Court's Order to

Show Cause and Petitioner's Motion for Leave to Amend, as related above.

reached the back door. [Petitioner] was holding a black .25 caliber gun. The gun was a "neighborhood gun"—a gun that was available to gang members in the neighborhood. Tapia backed away from [Petitioner] for fear that [Petitioner] might shoot him. Instead, [Petitioner] ran away.

After hearing the shots, Sanchez went to the kitchen. Pratti was lying between the kitchen and the bathroom. Parra and Tapia also saw Pratti lying on the floor. Pratti appeared to be severely injured. After several unsuccessful calls to 911, Tapia and a neighbor got Pratti into his car. Sanchez drove them to a nearby hospital. On the way to the hospital, Tapia found a .380 caliber pistol in Pratti's pocket.

Pratti died that night in the hospital. He suffered four bullet wounds, two of which were fatal. One gunshot wound was located on the back of Pratti's head, a second on the upper part of his left chest, a third on the left middle of the abdominal wall, and a fourth on the side of his left upper arm.

Sanchez gave police several different accounts of the shooting. She first told a sheriff's officer Pratti was shot while they were walking on Norwalk Boulevard. Sanchez said she did not know who shot Pratti. In response to subsequent questions, Sanchez said she and Pratti were walking on a different street when the shooting occurred. Sanchez next told the sheriff's officer that she and Pratti were eating in the living room of Parra's house when she heard [Petitioner] talking on his cell phone in the kitchen. Sanchez said Pratti went into the kitchen, then she heard four or five gunshots. At the hospital, Sanchez did not tell law enforcement officers that Parra and Tapia were at the house at the time of the shooting. She revealed that information only days or perhaps

months later. At trial, Sanchez testified she did not initially tell the sheriff's officer the truth because she was afraid of [Petitioner]. Sanchez also testified that before the shooting, Pratti had become afraid of [Petitioner]. On the night of the shooting Pratti was carrying a gun because he felt someone was after him; Pratti told Sanchez he thought [Petitioner] was after him. Sanchez was also present during conversations in which [Petitioner] told Pratti he thought his girlfriend was cheating on him.

Parra and Tapia both had outstanding warrants and therefore avoided law enforcement. They asked Sanchez not to tell the police they were at the house when Pratti was shot. They did not speak with the police until they were each in custody, several months after the shooting. Tapia admitted he used methamphetamine, and further admitted he used methamphetamine on the evening of the shooting. At trial, Parra denied using methamphetamine the evening of the shooting.

When sheriff's deputies went to Parra's house after the incident they found a baseball cap with a bullet hole and blood stains on the left rear of the hat. They also found a small caliber bullet and several expended shell casings. There were no bloodstains in the house.

The day after the shooting, Los Angeles County Sheriffs Deputies Larry Urrutia and Andres Lampkin were on patrol. They had received a special bulletin that [Petitioner] was wanted for murder. Deputy Urrutia was familiar with [Petitioner] from previous contacts. While on patrol, the deputies saw a vehicle matching the description of [Petitioner's] car. When the deputies pulled behind the car and activated the patrol car's overhead red and blue lights, the suspect car sped away. The deputies

followed. [Petitioner's] car exceeded the speed limit and failed to stop at a stop sign. As the car made a turn, Deputy Urrutia was able to see that the driver was [Petitioner]. [Petitioner] continued driving at a high rate of speed and passing vehicles on the right-hand side of the road in violation of traffic laws. While in pursuit, Deputy Urrutia lost control of the patrol car and crashed into a Montebello police vehicle. He lost consciousness, and suffered several gashes and bruises. Following the accident, Deputy Urrutia received stitches and surgery to remove debris from his left knee.[FN1]

[FN1] Following an internal investigation, the Sheriff's Department concluded the collision was primarily caused by Deputy Urrutia's attempt at an unsafe turning movement. Deputy Urrutia received a suspension for the accident.

Shortly after the deputies' collision with another vehicle, [Petitioner] drove off of a bridge and crashed in a riverbed or wash. Although [Petitioner] fled on foot, a search team located him hiding in a horse corral. Along the path of the high-speed pursuit, other sheriff's deputies found a .25 caliber handgun. The bottom of the gun had scuff marks, which, in one testifying deputy's experience, indicated the gun was thrown or collided with the ground or another object. A magazine clip containing .25 caliber rounds was located a few feet away from the handgun. Subsequent ballistics testing indicated that bullets retrieved from Pratti's body were fired from the .25 caliber gun recovered near the scene of the crash. The cartridges recovered from the scene of the shooting were also fired from the same pistol.

While in custody, [Petitioner] for a time was housed in the same facility as Sanchez's brother, Oscar. [Petitioner] told Oscar to talk to his sister because she was the one "fucking him over." [Petitioner] also told Oscar that since they were both in prison, "something could happen" to Oscar. Oscar later told [Petitioner] he had not talked to his sister. According to Oscar, [Petitioner] responded by telling his "homies" that Oscar was "a bitch" and to "fuck him."

In his defense, [Petitioner] offered the testimony of his girlfriend, Leah Garcia. Garcia testified that the day before the shooting, she and [Petitioner] went to Parra's house in the afternoon. Pratti was at the house. That evening [Petitioner] and Garcia returned to Parra's house. Garcia noticed no tension between [Petitioner] and Pratti. Her car would not start so she and [Petitioner] spent the night at Parra's house. The next day Garcia and [Petitioner] left Parra's house and were together until around 1:00 p.m., at which time they argued and [Petitioner] left. [Petitioner] returned that evening, but left after 7:30 p.m.; Garcia and [Petitioner] had continued to argue about their relationship. [Petitioner] called Garcia around 10:00 p.m., but she hung up on him. [Petitioner] returned to Garcia's home some time later, left, then returned again in the early morning hours and stayed through the afternoon. Garcia did not think that [Petitioner] was acting strange and noticed nothing unusual about him.

(Lodged Doc. B at 2–5.)

## STANDARD OF REVIEW

Under 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the

merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

■ Under AEDPA, the "clearly established Federal law" that controls federal habeas review consists of holdings of Supreme Court cases "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

■ Although a particular state-court decision may be both "contrary to" and "an unreasonable application of" controlling Supreme Court law, the two phrases have distinct meanings. *Id.* at 391, 412–13, 120 S.Ct. 1495. A state-court decision is "contrary to" clearly established federal law if it either applies a rule that contradicts governing Supreme Court law or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002). A state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Id.*

■ State-court decisions that are not "contrary to" Supreme Court law may be set aside on federal habeas review only "if they are not merely erroneous, but 'an

*unreasonable* application' of clearly established federal law, or based on 'an *unreasonable* determination of the facts' (emphasis added)." *Id.* at 11, 123 S.Ct. 362. A state-court decision that correctly identifies the governing legal rule may be rejected if it unreasonably applies the rule to the facts of a particular case. *Williams*, 529 U.S. at 407–08, 120 S.Ct. 1495. To obtain federal habeas relief for such an "unreasonable application," however, a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable." *Id.* at 409–10, 120 S.Ct. 1495. In other words, habeas relief is warranted only if the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 786–87, 178 L.Ed.2d 624 (2011).

Petitioner raised grounds one and two of the Petition on direct appeal, and the court of appeal rejected them on the merits.[5] (Lodged Docs. K, B.) Subsequently, the California Supreme Court denied Petitioner's petition for review without comment or citation to authority. (Lodged Doc. D.) The Court therefore "looks through" the state supreme court's silent denial to the last reasoned decision, the court of appeal decision on direct review, as the basis for the state court's judgment as to ground one. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–04, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (holding that California Supreme Court, by silently denying petition for review, presumably did not intend to change court of appeal's analysis); see also

---

5. The court did not specifically address Petitioner's due process claim concerning the DNA evidence. Because Petitioner has not pointed to anything in the record that would rebut the presumption that it was denied on the merits, the Court finds that it was. *See*

*Johnson v. Williams*, —— U.S. ——, 133 S.Ct. 1088, 1091–92, 185 L.Ed.2d 105 (2013) (extending presumption under *Richter* that state court's summary denial is on merits to situation in which state court expressly addresses some but not all claims).

*Berghuis v. Thompkins,* 560 U.S. 370, 380, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010) (when state supreme court denies discretionary review of decision on direct appeal, that decision is relevant state-court decision for purposes of AEDPA's standard of review).

As to ground two, because neither the court of appeal nor the supreme court specifically addressed Petitioner's federal constitutional claim, the Court conducts an independent review of the record to determine whether the state courts were objectively unreasonable in applying controlling federal law. *See Haney v. Adams,* 641 F.3d 1168, 1171 (9th Cir.2011) (holding that independent review "is not *de novo* review of the constitutional issue, but only a means to determine whether the state court decision is objectively unreasonable" (internal quotation marks omitted)); *see also Richter,* 131 S.Ct. at 784, 786 (holding that "petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief," and reviewing court "must determine what arguments or theories supported or ... could have supported[ ] the state court's decision[,] and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]").

Because the court of appeal adjudicated Petitioner's claims on the merits, the Court's review is limited by AEDPA deference. *See Richter,* 131 S.Ct. at 784.

## DISCUSSION

### I. *Petitioner's hearsay claim does not warrant habeas relief*

In ground one, Petitioner alleges the trial court's admission of the victim's hearsay statements violated the Confrontation Clause and deprived him of due process and a fair trial. (Pet. at 5, 48–55.)

### A. *Background*

On direct examination, Nancy Sanchez, Vito Pratti's fiancee, testified that Pratti had been carrying a gun for several days before the shooting because he felt Petitioner "was after him." (Lodged Doc. J, 3 Rep.'s Tr. at 642–43.) Defense counsel repeatedly objected to the testimony, arguing that it was hearsay (*id.* at 643); the prosecutor countered, however, that the statements went to the victim's state of mind:

> The victim's state of mind is relevant. It's not offered for it[ ]s truth, it's being offered to show that there was some sort of issue going on between him and [Petitioner], and that he started carrying a gun to protect himself because he was worried about the conduct of [Petitioner]. The defense is trying to explain their theory of the case here that these guys are buddies, and he comes in and shots [sic] him for no reason. That's why it's relevant, and it's not offered for the truth ... it's just offered as to his state of mind.

(*Id.* at 643–44.) Shortly thereafter, the following exchange occurred:

> [Defense counsel]: My question is how does the fact that supposedly my client was after the victim, how does that come in? That's hearsay.
>
> The court: Well, it explains the conduct of the victim on the night in question.
>
> [Prosecutor]: In carrying the gun.
>
> The court: Well, yeah.
>
> [Defense counsel]: So it goes to the state of mind of who?
>
> [Prosecutor]: Of the victim.

The court: Well, it explains the conduct on that night, though. More than the state of mind.

[Defense counsel]: But that's not a hearsay exception.

The court: Yeah, it is. To explain the conduct.

[Prosecutor]: What I'm saying is it's not offered for it[ ]s truth, it's just being offered to explain the conduct, like you said.

The court: Okay.

[Defense counsel]: So I'm going to ask to have that statement stricken.

The court: Okay. I'll overrule your objection.

(*Id.* at 645–46.)

Sanchez later testified—over defense counsel's objection—that Pratti had told her "he was concern[ed] about the way [Petitioner] was acting towards him" and didn't feel "safe" around Petitioner. (*Id.* at 651–52.) [6]

On direct review, the court of appeal held that the trial court had abused its discretion in admitting the statement but that the error was harmless and did not violate due process:

> Here, to the extent Pratti's hearsay statements were offered to prove [Petitioner's] conduct—i.e. that he did not simply shoot his "buddy" Pratti without reason and instead was "out to get" him—the statements are inadmissible hearsay. To the extent the statements were offered to prove Pratti's state of mind, the statements were irrelevant. The only question at trial was whether [Petitioner] or someone else shot Pratti. Pratti's conduct in carrying a gun was

not at issue during the trial; neither was his state of mind. [Petitioner] did not assert that the shooting was accidental or justified, nor was there any indication that Pratti intended to confront [Petitioner] about his past behavior, or any theory that Pratti's statements of fear had any effect on [Petitioner] or were relevant to premeditation.

> However, we conclude the error was harmless under any standard. The evidence indicating [Petitioner] shot Pratti was overwhelming. When Parra and Tapia left the house, only Sanchez, [Petitioner], Pratti, and Parra's minor son remained in the house. Parra and Tapia both testified they heard gunshots then saw [Petitioner] leaving the house holding a small black gun. [Petitioner] then ran away. Sanchez testified she heard gunshots after Pratti went into the kitchen, where [Petitioner] had entered the house. The day after Pratti was shot, [Petitioner] fled from police. The murder weapon—a small black gun—was located on the path [Petitioner] took in his car while attempting to escape law enforcement officers. [Petitioner] attacks the credibility of Sanchez, Parra, and Tapia, but despite any credibility weaknesses, their recollections of the events of the shooting were extremely consistent with one another. Moreover, Sanchez offered an explanation for her early false statements to police about the circumstances of the shooting.

> In light of the evidence and without even considering the DNA evidence [Petitioner] also challenges on other grounds, we find it is not reasonably probable that a result more favorable to

---

**6.** Later that day, the prosecutor moved to withdraw Sanchez's testimony that Pratti was carrying a gun because he thought Petitioner was going to kill him, acknowledging that he had not provided the statement to the defense in pretrial discovery. (Lodged Doc. J, 3 Rep.'s Tr. at 662.) Defense counsel stated that because "the cat [was] out of the bag," he preferred to keep it in and cross-examine Sanchez on it. (*Id.* at 662–63.)

[Petitioner] would have been reached had the trial court excluded Pratti's hearsay statements that he feared [Petitioner] was after him. Moreover, we find the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24[, 87 S.Ct. 824, 17 L.Ed.2d 705].) We therefore also reject [Petitioner's] argument that admission of the statements deprived him of a fair trial.

(Lodged Doc. B at 9–10.)

The court of appeal also found that the trial court's admission of the hearsay statement didn't violate Petitioner's confrontation rights under the Sixth Amendment:

> Under *Crawford v. Washington* (2004) 541 U.S. 36[, 124 S.Ct. 1354, 158 L.Ed.2d 177] (*Crawford*), the Supreme Court held the Sixth Amendment to the United States Constitution bars the admission of out-of-court testimonial statements unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. (*Crawford*, 541 U.S. at pp. 61–68[, 124 S.Ct. 1354].) Only testimonial statements pose potential Confrontation Clause problems. (*Davis v. Washington* (2006) 547 U.S. 813, 821[, 126 S.Ct. 2266, 165 L.Ed.2d 224].) "Testimonial statements are 'statements, made with some formality, which, *viewed objectively*, are for the *primary purpose* of establishing and proving facts for possible use in a criminal trial.' [Citation.] An 'informal statement made in an unstructured setting' generally does not constitute a testimonial statement. [Citation.]" ([*People v.*] *Garcia* [ (2008) ] 168 Cal.App.4th [261] at p. 291[, 85 Cal.Rptr.3d 393], quoting *People v. Cage* (2007) 40 Cal.4th 965, 984 fn. 14[, 56 Cal.Rptr.3d 789, 155 P.3d 205] (*Cage*).)

> Pratti's hearsay statements to Sanchez about [Petitioner] were not testimonial. There was no reason to believe the statements "occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony." (*Cage, supra,* 40 Cal.4th at p. 984[, 56 Cal.Rptr.3d 789, 155 P.3d 205].) Nothing in the evidence suggested Pratti's statements to his girlfriend were made " ' "under circumstances which would lead an objective *witness* reasonably to believe that the statement[s] would be available for use at a later trial." ' [Citation.]" (*People v. Jefferson* (2008) 158 Cal.App.4th 830, 843[, 70 Cal.Rptr.3d 451].)

> The admission of Pratti's statements did not implicate [Petitioner's] Sixth Amendment confrontation rights.

(Lodged Doc. B at 10–11 (some citations omitted).)

### B. *Confrontation Clause*

 The Confrontation Clause of the Sixth Amendment affords a criminal defendant the right to cross-examine witnesses against him. *Delaware v. Van Arsdall,* 475 U.S. 673, 678, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). In *Crawford v. Washington,* 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court held that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Conversely, the Confrontation Clause does not bar nontestimonial statements. *Id.* at 68, 124 S.Ct. 1354; *see Davis v. Washington,* 547 U.S. 813, 821, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) ("It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.")

*Crawford* did not spell out a comprehensive list of "testimonial" statements but noted that they include (1) "*ex parte* in-court testimony or its functional equivalent," such as affidavits, custodial examinations, prior testimony made without cross-examination, and "similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; (2) extrajudicial statements contained in formalized testimonial materials; and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." 541 U.S. at 51–52, 68, 124 S.Ct. 1354 (holding recording of eyewitness's inculpatory statement made in custodial interrogation "testimonial" in nature); *see Davis*, 547 U.S. at 827–28, 126 S.Ct. 2266 (holding statements made by domestic-abuse victim to 911 operator nontestimonial).

 A Confrontation Clause violation is subject to harmless error analysis. *Ocampo v. Vail*, 649 F.3d 1098, 1114 (9th Cir.2011). Thus, a habeas petitioner is generally not entitled to relief unless the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

 As an initial matter, Respondent contends that Petitioner has procedurally defaulted the Confrontation Clause claim because the court of appeal found that he forfeited it by failing to raise the issue at the trial level. (Answer at 12 (citing Lodged Doc. B at 10).) Because it is easier to dispose of this claim on the merits, the Court resolves it solely on that basis. *See Lambrix v. Singletary*, 520 U.S. 518, 524–25, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997).

The court of appeal was not objectively unreasonable in denying Petitioner's claim that admission of the victim's hearsay statements violated the Confrontation Clause. To the extent Petitioner challenges the admission of Pratti's out-of-court statements under state law, the claim is not cognizable on federal habeas review. *See Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). As to the federal nature of the claim, the court of appeal's determination that the statements were nontestimonial was not objectively unreasonable. Here, Petitioner presented no evidence that Pratti's statements to Sanchez—that is, Pratti felt Petitioner "was after him" (Lodged Doc. B at 642), he "didn't feel safe" around Petitioner, and he believed Petitioner was "acting weird" (*id.* at 652)— were made "under circumstances which would lead an objective witness reasonably to believe that it would be available for use at a later trial." *Parle v. Runnels*, 387 F.3d 1030, 1037 (9th Cir.2004) (alteration and internal quotation marks omitted). To the contrary, they were made to his fiancee in confidence, before any crime had even occurred.[7] *See United States v.*

---

**7.** After conceding that the "Supreme Court has yet to affirmatively rule that statements to friends, family, and/or acquaintances fall within the Confrontation clause" (Reply at 5), Petitioner cites *Davis*, 547 U.S. at 828, 126 S.Ct. 2266, for the proposition that "out-of-court statements to someone other than law enforcement (or made specifically in preparation for trial) might well fall under the Confrontation Clause." (Reply at 5.) But *Davis* was decided in a different context. In that case, the Court held that a victim's out-of-court statements to a 911 operator were primarily nontestimonial because they were made during an ongoing emergency; the Court simply noted that a conversation that began as a response to an emergency could theoretically "evolve into testimonial statements" once the emergency ended. *Davis*, 547 U.S. at 828, 126 S.Ct. 2266 (internal

*Manfre,* 368 F.3d 832, 838 n. 1 (8th Cir. 2004) (comments "made to loved ones or acquaintances ... are not the kind of memorialized, judicial-process-created evidence of which *Crawford* speaks"). Thus, the court of appeal was not objectively unreasonable in denying this argument. *See Crawford,* 541 U.S. at 68, 124 S.Ct. 1354.

▬▬▬ In any event, admission of the hearsay statements did not have a substantial and injurious effect on the jury's verdicts considering the overwhelming evidence of Petitioner's guilt. *Brecht,* 507 U.S. at 638, 113 S.Ct. 1710. That evidence included, among other things, Sanchez's testimony that she saw Petitioner in the kitchen shortly before the shooting (Lodged Doc. J, 3 Rep.'s Tr. at 628), Pratti then went into the kitchen and she immediately heard four gunshots (*id.* at 632–33), and she had seen Petitioner with a small black gun the day before the shooting (*id.* at 653). Further, Parra, who was outside the home when Pratti was shot, testified that she ran into the house immediately after the shooting and saw Petitioner holding a small gun (*id.* at 725–26); Tapia, who was outside with Parra at the time of the shooting, similarly testified that he ran into the house after hearing the gunshots and saw Petitioner holding a small black gun (*id.* at 768–69). Tapia testified that Petitioner ran away after the shooting.

(*Id.* at 771.) A deputy sheriff testified that the day after the shooting, Petitioner fled when the deputy attempted to conduct a traffic stop of a car Petitioner was driving. (Lodged Doc. J, 4 Rep.'s Tr. at 915–16.) Another officer testified that shortly afterward, a small gun was found "along the same path of travel taken" by Petitioner when he attempted to evade the police. (*Id.* at 960–61.) Finally, a firearm-identification specialist testified that the four bullets fired into the victim as well as three cartridge cases recovered from the murder scene all originated from the gun found by police.[8] (Lodged Doc. J, 5 Rep.'s Tr. at 1254, 1258–59.)

Thus, for all these reasons, the court of appeal was not objectively unreasonable in denying Petitioner's claim that the trial court violated the Confrontation Clause by admitting Pratti's hearsay statements.

## C. *Due Process*

▬▬▬ A federal habeas court does not review "questions of state evidence law." *Spivey v. Rocha,* 194 F.3d 971, 977 (9th Cir.1999). Only if a petitioner asserts that the admission of evidence by the state court violated his due process rights is the claim cognizable on federal habeas review, and then only if the evidence rendered the trial "fundamentally unfair." *Holley v. Yarborough,* 568 F.3d 1091, 1101 (9th Cir.

---

quotation marks omitted). In any event, nothing in the record indicates that Pratti's statements to Sanchez were made in the context of such an emergency. Indeed, it appears he was merely explaining his fear of Petitioner to his fiancee. Thus, *Davis* does not help Petitioner.

8. Petitioner points to inconsistencies in the evidence and argues that several of the prosecution's witnesses were unreliable. (*See, e.g.,* Reply at 8–10.) A federal habeas court faced with a factual record "that supports conflicting inferences must presume ... that the trier of fact resolved any such conflicts in favor of

the prosecution, and must defer to that resolution." *Jackson v. Virginia,* 443 U.S. 307, 326, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Thus, the Court must assume that the jury rejected Petitioner's interpretations of the evidence. Indeed, under *Jackson,* the credibility of a witness is "generally beyond the scope of review." *Schlup v. Delo,* 513 U.S. 298, 330, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); *see also Walters v. Maass,* 45 F.3d 1355, 1358 (9th Cir.1995) ("reviewing court must respect the province of the jury to determine the credibility of witnesses").

2009). The admission of inculpatory evidence violated due process only if there were no permissible inferences the jury could have drawn from the evidence, which was so inflammatory that it necessarily prevented a fair trial. *Windham v. Merkle,* 163 F.3d 1092, 1103 (9th Cir.1998); *see Hovey v. Ayers,* 458 F.3d 892, 923 (9th Cir.2006) ("Even if there are no permissible inferences the jury can draw from the evidence in question, due process is violated only if the evidence is of such quality as necessarily prevents a fair trial." (internal quotation marks omitted)). The Supreme Court has made "very few rulings regarding the admission of evidence as a violation of due process"; specifically, it has never "made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant the issuance of the writ." *Holley,* 568 F.3d at 1101; *see McGuire,* 502 U.S. at 70, 112 S.Ct. 475 (holding that admission of relevant evidence generally not due process violation warranting habeas relief).

 The court of appeal was not objectively unreasonable in denying Petitioner's claim that admission of Pratti's hearsay statements deprived Petitioner of due process and a fair trial. Petitioner alleges that the hearsay statements were "not reliable" and "extremely damaging." (Pet. at 49.) Absent clearly established federal law recognizing that the admission of irrelevant or prejudicial evidence violates due process, the court of appeal could not have been unreasonable under AEDPA. *See Wright v. Van Patten,* 552 U.S. 120, 125–26, 128 S.Ct. 743, 169 L.Ed.2d 583 (2008) (holding that state court could not have unreasonably applied federal law if no clear Supreme Court precedent existed); *Holley,* 568 F.3d at 1101.

In any event, even if Pratti's hearsay statements were erroneously admitted, as the court of appeal found (Lodged Doc. B at 8), their admission did not have a substantial and injurious effect in determining the verdict. *See Brecht,* 507 U.S. at 638, 113 S.Ct. 1710. As related above in Section I.B, substantial other evidence existed of Petitioner's guilt. Thus, the court of appeal's rejection of the claim was not objectively unreasonable and Petitioner is not entitled to habeas relief. *See Rivera v. Long,* No. EDCV 12–2197 GAF (FFM), 2013 WL 2430485, at *14 (C.D.Cal. June 1, 2013) (rejecting due-process claim based on admission of victim's statements to witness that she feared petitioner in part because "there was a substantial amount of other evidence of Petitioner's guilt separate and apart from [the witness's] testimony").

## II. *Petitioner's admission-of-DNA-evidence claim does not warrant habeas relief*

In ground two, Petitioner alleges that the trial court's refusal to exclude contaminated DNA evidence deprived him of due process. (Pet. at 6, 56–61.)

### A. *Applicable Law* [9]

The Supreme Court has not delineated any controlling legal standard for evaluating the admission of DNA evidence. *See Kumar v. Yates,* No. CIV S–09–2455 JAM CHS P, 2011 WL 2295030, at *12 (E.D.Cal. June 8, 2011) (rejecting petitioner's DNA evidentiary claims based on "lack of clearly established precedent, as the Supreme Court has not established specific constitutional requirements for the admissibility of DNA evidence"); *see also Robinson v. Hedgpeth,* No. CV 12–2084 JVS (SS), 2013 WL 6185027, at *12 (C.D.Cal. Nov. 25, 2013) (noting it unlikely that rejection of

---

**9.** The Court incorporates the relevant law from Section I.C.

claim based on admission of DNA evidence could be basis for federal habeas relief given lack of clearly established federal law).[10]

## B. *Background*

The court of appeal provided the background to Petitioner's claim that the trial court erred in admitting the DNA evidence:

> Prior to trial, [Petitioner] sought to exclude DNA evidence the People planned to present. At a hearing held pursuant to Evidence Code section 402, the prosecution expert testified that the testing conducted did not reveal that [Petitioner's] DNA "matched" the samples taken from the gun or the magazine clip because the samples contained a mixture of DNA from more than one person. However, [Petitioner] was a possible contributor to each sample. The expert opined with respect to the pistol DNA sample that one person in one thousand would be included as a possible DNA contributor. With respect to the magazine clip sample, one person out of ten in the general population would be included as a possible DNA contributor. The expert admitted contamination had occurred in the testing process. However, he explained that despite the contamination, his analysis remained that [Petitioner] was a possible contributor to the DNA samples.

[Petitioner] argued the results of the DNA testing were inherently unreliable because they were contaminated by multiple sources. [Petitioner] further contended that given the complicated nature of the information and the results, the jury might not understand the unreliability of the results through cross-examination. [Petitioner] asserted it could take a long time on cross-examination to help the jury to understand the import of the probabilities the expert was prepared to offer. [Petitioner] argued that under Evidence Code section 352, the probative value was slight when compared with how many other people could have contributed DNA to the samples, the time it would take to explain the evidence to the jury, and the confusion it might cause.

The trial court rejected [Petitioner's] argument under Evidence Code section 801, and reserved a ruling under Evidence Code section 352, with the understanding that [Petitioner] could raise the argument later. At trial, the prosecution expert testified at length about the contamination of the process. He gave the following opinions: "[T]he DNA recovered from the pistol swab is a mixture from more than one person.... [Petitioner] is not excluded from contributing to the mixture. And his possible inclusion is apparently not the result of contamination in the blank. [¶] Moreover, approximately one person in a thousand would be not excluded as ... to the mixture." The expert's conclu-

---

10. The Supreme Court granted certiorari in *McDaniel v. Brown*, 558 U.S. 120, 130 S.Ct. 665, 175 L.Ed.2d 582 (2010), a habeas case involving a due process challenge to supposedly unreliable testimony from a DNA expert. The Court subsequently refused to address the "DNA due process claim," however, because the petitioner had forfeited it. 558 U.S. at 135–36, 130 S.Ct. 665. In dictum, *Brown* noted that "[g]iven the persuasiveness of

[DNA] evidence in the eyes of the jury, it is important that it be presented in a fair and reliable manner." *Id.* at 136, 130 S.Ct. 665. *Brown's* dictum, however, does not constitute clearly established Supreme Court precedent for AEDPA purposes, *Williams*, 529 U.S. at 412, 120 S.Ct. 1495 (clearly established federal law consists of Supreme Court holdings, not dicta), and in any event is nothing more than an obvious truism.

sions regarding the swab from the magazine cartridge were similar, except he admitted the statistics were "much more feeble than the pistol swab" in that "approximately one person in 10 would be similarly not excluded from the mixture of the magazine swabs, just as [Petitioner] is not excluded."[11]

(Lodged Doc. B at 11–12.)

The court of appeal denied Petitioner's claim:

> Contrary to [Petitioner's] contentions, the prosecution expert's testimony was not based on speculative factors. Nor were the results of the DNA testing merely a guess or conjecture. Instead, the expert described a testing process that required expert explanation, and informed the jury of the relevant probabilities that [Petitioner] contributed DNA to the samples taken from the gun and magazine clip. Problems with contamination and the minimally probative results of the testing all went to the weight of the evidence, not its admissibility. The trial court did not abuse its discretion in admitting the testimony and allowing the jury to determine how much weight to assign to the evidence.
>
> ... [Petitioner] asserts the trial court should have excluded the expert testimony because it required an undue consumption of time and created "substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid.Code § 352, subds. (a), (b).) However, at trial, the prosecution expert's testimony was relatively short, as was the cross-examination and the testimony of the expert the defense offered to critique the prosecution evidence. Further the testimony was not misleading. The expert admitted there was contamination but offered an opin-

ion that the results were still valid. The expert did not claim there was a DNA "match," but instead explained the probabilities that [Petitioner] was a contributor of DNA to the samples. The DNA evidence thus did not appear to be more than it was—a quantifiable probability that [Petitioner] handled the gun and magazine clip. The trial court did not abuse its discretion in admitting this evidence.

(Lodged Doc. B at 13–14 (some citations and footnotes omitted).)

### C. Analysis

The court of appeal was not objectively unreasonable in denying Petitioner's claim that the trial court's refusal to exclude the DNA evidence deprived him of due process. Petitioner alleges that the evidence was more prejudicial than probative because of "the contamination and the vagueness of the results" and that he was "severely prejudiced" by its admission given the credibility issues of some of the witnesses. (Reply at 13.) To the extent Petitioner challenges admission of the evidence under the California Evidence Code, his claim is not cognizable on federal habeas review because it involves only the application and interpretation of state law. *See* 28 U.S.C. § 2254(a); *McGuire*, 502 U.S. at 68, 112 S.Ct. 475. The court of appeal concluded as a matter of California evidentiary law that the trial court did not err in admitting the evidence (*see* Lodged Doc. B at 13–14), and this Court is bound by that conclusion. *See Bradshaw v. Richey*, 546 U.S. 74, 76, 126 S.Ct. 602, 163 L.Ed.2d 407 (2005) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). Further, absent clearly estab-

---

11. As the court of appeal noted, the defense expert opined that "the contamination was a major problem in the testing of the samples." (Lodged Doc. B at 6.)

lished federal law recognizing that admission of irrelevant or prejudicial evidence violates due process, the court of appeal could not have been unreasonable under AEDPA. *See Wright,* 552 U.S. at 125–26, 128 S.Ct. 743; *Holley,* 568 F.3d at 1101.

■ In any event, admission of the DNA evidence did not render Petitioner's trial fundamentally unfair because the evidence was probative and sufficiently reliable. Thomas Fedor, the forensic serologist, testified that he compared DNA swabs from the handgun and a magazine clip with Petitioner's DNA sample (Lodged Doc. J, 5 Rep.'s Tr. at 1214); although the extraction blanks he prepared of the gun and magazine clip were contaminated (*id.* at 1216), he explained to the jury how the contamination affected his analysis (*id.* at 1219–21). Based on this analysis, Fedor testified that as to the gun, Petitioner was "not excluded" from contributing to the DNA mixture and that "only one person in one thousand would be in a similar position" as Petitioner (*id.* at 1224); as to the magazine clip, Petitioner was "not excluded" from contributing to the DNA mixture, and "one person in 10 would be similarly not excluded" (*id.* at 1225). Considering that the gunman's identity was the key issue in the case, the testimony made it "more likely" Petitioner was the gunman; thus, admission of the evidence did not deprive Petitioner of due process. *See Boyde v. Brown,* 404 F.3d 1159, 1172–73 (9th Cir.) (admission of evidence didn't violate due process when "jury could draw permissible inference" from it), *amended on other grounds by* 421 F.3d 1154 (9th Cir.2005).

In any event, even if the trial court improperly admitted the DNA evidence, any such error did not have a substantial and injurious effect on the verdicts in light of the substantial evidence of Petitioner's guilt, as related above in Section I.B. *See Brecht,* 507 U.S. at 638, 113 S.Ct. 1710.

■ Finally, Petitioner presented his own expert testimony concerning the results of the DNA testing. Petitioner's expert testified that the contamination was "extremely high level" and that he had "never seen a level of contamination with peeks [sic] as high as the peeks [sic] we got from that." (Lodged Doc. J, 5 Rep.'s Tr. at 1317.) He further testified that Fedor's operating procedures as to the DNA analysis weren't "generally accepted in relevant scientific communities." (*Id.* at 1320.) The jury was instructed that if

> expert witnesses disagreed with one another, you should weigh each opinion against the others. You should examine the reasons given for each opinion and the facts or other matters on which each witness relied. You may also compare the experts' qualifications.

(Lodged Doc. I, 1 Clerk's Tr. at 134.) The jury is presumed to have followed the court's instructions, *Weeks v. Angelone,* 528 U.S. 225, 234, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000), and simply to have credited the People's expert witness over Petitioner's or not to have given much weight to either's testimony. Given that the gun was found in Petitioner's flight path from the police, DNA evidence tying him to it was merely cumulative.

Thus, for all these reasons, Petitioner is not entitled to habeas relief on this claim.

### III. *Petitioner's request for an evidentiary hearing should be denied*

■ Petitioner seeks an evidentiary hearing. (Reply at 1.) The Court should deny his request. An evidentiary hearing is not required on issues that can be resolved by reference to the state-court record under § 2254(d), as Petitioner's claims can. *Cullen v. Pinholster,* —— U.S. ——, 131 S.Ct. 1388, 1399, 179 L.Ed.2d 557

(2011) ("[W]hen the state-court record precludes habeas relief under the limitations of § 2254(d), a district court is not required to hold an evidentiary hearing." (internal quotation marks omitted)).

## RECOMMENDATION

IT THEREFORE IS RECOMMENDED that the District Judge issue an Order (1) approving and accepting this Report and Recommendation, (2) denying Petitioner's request for an evidentiary hearing, and (3) directing that Judgment be entered denying the Petition and dismissing this action with prejudice.

DATED: June 30, 2014.