Filed 6/7/21  P. v. Lowe CA2/4

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B302993 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. A975989 |
| ROBERT ULMER LOWE, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Curtis B. Rappe, Judge. Affirmed.

Kiana Sloan-Hillier, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Attorney General, Charles S. Lee and David W. Williams, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

Senate Bill No. 1437 (2017-2018 Reg. Sess.) (SB 1437), effective January 1, 2019, amended the felony-murder rule and eliminated the natural and probable consequences doctrine as it relates to murder. Under Penal Code section 1170.95,[1] a person who was convicted under theories of felony murder or murder under the natural and probable consequences doctrine, and who could not be convicted of murder following the enactment of SB 1437, may petition the sentencing court to vacate the conviction and resentence on any remaining counts.

In 1991, a jury convicted defendant and appellant Robert Ulmer Lowe of second-degree murder. In 2019, Lowe filed a petition for recall and resentencing under section 1170.95. After holding an evidentiary hearing under section 1170.95, subdivision (d), the trial court denied the petition, concluding the prosecution had proven beyond a reasonable doubt Lowe was a direct aider and abettor in the murder who harbored the intent to kill.

On appeal, Lowe contends the trial court erred in denying his petition, arguing there was insufficient evidence that he harbored the intent to kill. We reject Lowe's contention and affirm the denial of his petition.

## PROCEDURAL BACKGROUND

In 1991, a jury convicted Lowe of second-degree murder (§ 187, subd. (a); count one) and aggravated kidnapping (§ 209, subd. (a); count two). Three codefendants were also convicted of

---

1      All undesignated statutory references are to the Penal Code.

the same counts.[2] The trial court sentenced Lowe to life without parole (LWOP) for count two (aggravated kidnapping), and a concurrent term of 15 years to life in prison for count one (murder). In 1997, this court affirmed the convictions, but stayed Lowe's sentence on the murder conviction. In 2019, Lowe filed a petition for resentencing under section 1170.95 through private counsel. The trial court issued an order to show cause under section 1170.95, subdivision (c), and scheduled an evidentiary hearing. After holding the evidentiary hearing, the court denied Lowe's petition in a written opinion. The court recited the facts of the case, and found Lowe "intended to aid and abet [two codefendants to] murder Roy Radin." It also found the evidence was "[m]ore than sufficient to support a finding of implied malice," and that Lowe "acted as a direct aider and abettor who acted with malice." The court thus denied the petition, concluding the prosecution had "proven beyond a reasonable doubt that petitioner is ineligible for resentencing because he could be convicted of first or second degree murder under the current law after Senate Bill 1437 went into effect . . . ."

Lowe timely appealed the denial of his petition.

---

2     The jury found count one to be murder in the first degree as to two codefendants (William Mentzer and Alex Marti). As to the third codefendant (Karen Greenberger), the jury found count one to be murder in the second degree, as it also did for Lowe.

# FACTUAL BACKGROUND[3]

"The prosecution presented evidence to support its theory that defendant Greenberger hired defendants Mentzer, Marti and Lowe to kidnap and murder Roy Radin because Radin had cut her out of a Hollywood movie deal and had been involved in the theft of cocaine and money from her house." (*Greenberger*, *supra*, 58 Cal.App.4th at p. 316.)

"On April 18, 1983, someone stole 10 kilograms of cocaine and $275,000 in cash from Greenberger's home in Sherman Oaks. Greenberger suspected that Tally Rogers, who had disappeared, had committed this theft. She had received the cocaine from Milan Bellachasses and was afraid that she would be held responsible by Bellachases for the loss of the cocaine and money. Bellachasses was a major cocaine distributor in Miami and Greenberger's supplier. Upon discovery of the theft Greenberger hired Mentzer as a bodyguard. Marc Fogel had introduced her to Mentzer. Greenberger had supplied cocaine to Fogel in the past." (*Greenberger*, *supra*, 58 Cal.App.4th at pp. 316-317.)

"Greenberger called Radin in New York in late April and told him she was looking for Rogers because he had stolen the money and cocaine from her house. She accused Radin of knowing where Rogers was and of being involved in Rogers's disappearance. Radin became angry and hung up." (*Greenberger*, *supra*, 58 Cal.App.4th at p. 317.)

"On May 13 Mentzer obtained the use of a limousine and another car with the assistance of Marc Fogel. On that same day

---

3    The following is a shortened recitation of the facts in our opinion resolving Lowe's direct appeal, *People v. Greenberger* (1997) 58 Cal.App.4th 298 (*Greenberger*).

a meeting occurred at Mentzer's apartment in Los Angeles. Mentzer, Lowe, Marti, Carl John Plzak and Raja Korban were present. Korban and Plzak first met Mentzer, Marti and Lowe when they all worked at an agency that performed vehicle repossessions and private detective services. Plzak worked for Mentzer in April 1983 providing security and surveillance for Greenberger . . . .

"While driving to this meeting Marti told Korban that the 'fat scumbag' who owed money to a woman was going to be killed. At the meeting Mentzer, in the presence of Lowe and Marti, described the plan to kidnap Radin. Both Plzak and Korban testified at trial under a grant of immunity. They testified that the plan called for Plzak and Korban to wait for Jonathan Lawson, Radin's personal assistant, to leave the hotel as Greenberger met with Radin that night. Lawson was expected to go to Greenberger's car which was parked near an apartment Greenberger rented in Beverly Hills. Plzak and Korban were to kidnap Lawson who was to be used as leverage to get information from Radin about the location of the money and cocaine. They were to communicate with the others by walkie-talkie about their progress with Lawson.

"The plan further called for Lowe to chauffeur Greenberger and Radin in the limousine Mentzer had obtained the previous day. They were to drive from Radin's hotel to a restaurant in Beverly Hills. The plan called for Greenberger to get out of the limousine at some point en route to Beverly Hills and for Mentzer and Marti to get in and force Radin to the floor at gunpoint.

"Korban testified that Mentzer told the group that Lowe, Mentzer and Marti would drive Radin to the desert, and they would try to get information from Radin regarding the money

owed Greenberger. Once in the desert the plan was to shoot Radin and blow up his face so his corpse could not be identified.

"Marti had a gym bag containing a handgun during this meeting. Mentzer had a bag with handcuffs, gloves and small explosives. Mentzer, who said he was being paid a 'lot of money' by Greenberger for the job, gave Korban an envelope containing $500 and a similar envelope and a walkie-talkie to Plzak." (*Greenberger*, *supra*, 58 Cal.App.4th at pp. 317-318.)

"Plzak went to Mentzer's apartment in the early morning of May 14 at Mentzer's request and met with Mentzer and Lowe. Mentzer described to Plzak the events of the previous night. He described how he and Marti had entered the limousine. Mentzer said they thought the police were following them, and they were about to be stopped. He stated that he jammed the gun into 'the producer's' mouth and forced him to the floor. Mentzer stated Lowe then drove them to the desert where Mentzer and Marti shot Radin 27 times. They had taken Radin's Rolex watch and gun. Lowe stated to Plzak that he had to walk away from the shooting because he could not watch. Lowe also said that he cleaned the interior of the limousine after the shooting.

"Lowe and Plzak then left to return the limousine to the rental office from which it had been obtained. Lowe told Plzak that Radin said that he did not know where the money was. Both Lowe and Mentzer described Radin as 'the fat pig' or 'fat pig producer.'" (*Greenberger*, *supra*, 58 Cal.App.4th at pp. 319-320.)

"Radin was reported missing by his friends in mid-May. A badly decomposed body was discovered June 10, 1983, in Caswell Canyon, a remote area in northern Los Angeles County. The circumstances of the discovery of the body were unconnected to Radin's disappearance. The body was identified as Roy Radin by

dental records and fingerprints. There was no jewelry or identification on the body.

"Forensic pathological examination of the body disclosed that Radin had been shot numerous times in the head with .22-caliber bullets. The face had been damaged in a manner consistent with an explosive device having been placed in his mouth. The condition of the body was consistent with death having occurred on May 13, 1983." (*Greenberger, supra,* 58 Cal.App.4th at p. 320.)

"The police investigation included searches of the residences of Mentzer and Marti and a search of storage lockers used by Mentzer. The police located and interviewed Plzak and Korban and used undercover operative William Rider to obtain tape-recorded incriminatory statements from Mentzer and Lowe in 1988. Rider was an acquaintance of Mentzer, Marti and Lowe. Rider had spoken to Marti and Mentzer in 1983, and each had admitted involvement in the Radin murder. Rider testified for the prosecution about the 1983 admissions, and tape recordings of the 1988 conversations with Mentzer and Lowe were played to the jury." (*Greenberger, supra,* 58 Cal.App.4th at p. 320.)[4]

"Marti also made certain admissions to Estanislau Kreutzer whom Marti employed in 1986-1987 to help him in the distribution of cocaine. Kreutzer was a friend of Marti from Argentina. [Footnote omitted.] Kreutzer testified that Marti warned him on numerous occasions in 1986 and 1987 not to steal from him. Marti made veiled references to the murder of Radin by saying that he had been involved in the shooting of a 'poor guy'

---

4      The contents of these conversations are set forth in our opinion resolving Lowe's direct appeal. (*Greenberger, supra,* 58 Cal.App.4th at pp. 382-388.)

who had stolen $300,000 and 10 kilograms of cocaine, but that he had not been in charge of the murder. Kreutzer observed a photograph on a desk in Marti's house. The photograph depicted Marti holding a gun and standing next to Mentzer. Marti told Kreutzer that the location where the photograph was taken was near Magic Mountain (in the vicinity where Radin's body was discovered) and that he needed to find a new place to dump bodies because that place was full.

"Mentzer, Marti, and Greenberger were arrested on October 2, 1988. Lowe was arrested on October 3, 1988." (*Greenberger*, *supra*, 58 Cal.App.4th at p. 321.)

"The day before the [murder] Lowe was present at the meeting in Mentzer's apartment during which the plan to kidnap Radin was discussed. Mentzer stated he was being paid a 'lot of money' by Greenberger for the job. Lowe was described by Mentzer in the meeting as the person who would drive Radin and Greenberger in the limousine to a location where he would permit Mentzer and Marti to enter and Greenberger to exit, and would then drive the forcibly detained Radin to the desert where Mentzer and Marti would try to extract information regarding the stolen drugs and money from him. Mentzer and Marti were to be armed with guns and explosives, which were plainly visible during the meeting. The scheme was executed as planned. Thereafter, Lowe received payment of money and a car." (*Greenberger*, *supra*, 58 Cal.App.4th at p. 372.)

## DISCUSSION

### I. Governing Principles

#### A. SB 1437's Limitation of Accomplice Liability for Murder

The Legislature enacted SB 1437 "to amend the felony-murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) SB 1437 amended section 189 to provide that a participant in qualifying felonies during which death occurs generally will not be liable for murder unless the person was (1) "the actual killer," (2) a direct aider and abettor in first degree murder, or (3) "a major participant in the underlying felony [who] acted with reckless indifference to human life[.]" (§ 189, subd. (e).)[5]

SB 1437 also "added a crucial limitation to section 188's definition of malice for purposes of the crime of murder." (*People v. Verdugo* (2020) 44 Cal.App.5th 320, 326, fn. omitted, rev. granted, S260493, Mar. 18, 2020 (*Verdugo*).) Under new section 188, subdivision (a)(3), "'[m]alice shall not be imputed to a person

---

5    This limitation does not apply "when the victim is a peace officer who was killed while in the course of the peace officer's duties, where the defendant knew or reasonably should have known that the victim was a peace officer engaged in the performance of the peace officer's duties." (§ 189, subd. (f).)

based solely on his or her participation in a crime.' [Citations.]" (*People v. Lewis* (2020) 43 Cal.App.5th 1128, 1135, fn. omitted (*Lewis*), rev. granted, S260598, Mar. 18, 2020.)[6] "As a result, the natural and probable consequences doctrine can no longer be used to support a murder conviction." (*Ibid.*)

## B. Petitions to Vacate Prior Convictions

SB 1437 also added section 1170.95 to the Penal Code. This section permits individuals who were convicted of felony murder or murder under a natural and probable consequences theory, but who could not be convicted of murder following SB 1437's changes to sections 188 and 189, to petition the sentencing court to vacate the conviction and resentence on any remaining counts. (§ 1170.95, subd. (a).) A petition for relief under section 1170.95 must include: "(A) A declaration by the petitioner that he or she is eligible for relief under this section, based on all the requirements of subdivision (a). [¶] (B) The superior court case number and year of the petitioner's conviction. [¶] (C) Whether the petitioner requests the appointment of counsel." (§ 1170.95,

_____

6    The review order in *People v. Lewis* states: "The issues to be briefed and argued are limited to the following: (1) May superior courts consider the record of conviction in determining whether a defendant has made a prima facie showing of eligibility for relief under Penal Code section 1170.95? (2) When does the right to appointed counsel arise under Penal Code section 1170.95, subdivision (c)." (*Lewis*, S260598, Supreme Court Mins. Mar. 18, 2020.) The review order in *Verdugo* states: "Further action in this matter is deferred pending consideration and disposition of a related issue in *People v. Lewis*, S260598 (see Cal. Rules of Court, rule 8.512(d)(2)), or pending further order of the court." (*Verdugo*, S260493, Supreme Court Mins., Mar. 18, 2020.)

subd. (b)(1).) If any of the information is missing "and cannot be readily ascertained by the court, the court may deny the petition without prejudice to the filing of another petition and advise the petitioner that the matter cannot be considered without the missing information." (§ 1170.95, subd. (b)(2).)

If the petition contains the required information, section 1170.95, subdivision (c), prescribes "a two-step process" for the court to determine if it should issue an order to show cause. (*Verdugo*, *supra*, 44 Cal.App.5th at p. 327.) First, the court must "review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of this section." (§ 1170.95, subd. (c).) If the petitioner has made this initial prima facie showing, and has requested that counsel be appointed, he or she is then entitled to appointed counsel. (*Ibid.*; *Lewis*, *supra*, 43 Cal.App.5th at p. 1140 ["trial court's duty to appoint counsel does not arise unless and until the court makes the threshold determination that petitioner 'falls within the provisions' of the statute."].) The court then reviews the petition a second time. If, in light of the parties' briefing, it concludes the petitioner has made a prima facie showing that he or she is entitled to relief, it must issue an order to show cause. (§ 1170.95, subd. (c); *Verdugo*, *supra*, 44 Cal.App.5th at p. 328.)

"Once the order to show cause issues, the court must hold a hearing to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts." (*Verdugo*, *supra*, 44 Cal.App.5th at p. 327, citing § 1170.95, subd. (d)(1).) At the hearing, the parties may rely on the record of conviction or present "new or additional evidence" to support their positions, and "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt,

11

that the petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3).)

## II. Substantial evidence supports the trial court's finding that Lowe was ineligible for resentencing

On appeal, Lowe contends the trial court's finding that he was ineligible for section 1170.95 relief is not supported by substantial evidence. As mentioned above, after holding an evidentiary hearing under section 1170.95, subdivision (d), the trial court denied the petition, concluding the prosecution had sustained its burden of proving beyond a reasonable doubt Lowe was a direct aider and abettor who harbored the intent to kill.

Before reaching the merits of Lowe's sufficiency argument, we first address a preliminary matter. There is currently a split in authority on what legal standard a trial court should apply at an 1170.95, subdivision (d) hearing. In *People v. Duke* (2020) 55 Cal.App.5th 113, 123 (*Duke*), review granted January 13, 2021, S265309, Division One of the Second Appellate District concluded the applicable standard is akin to substantial evidence review, and as such, the trial court's inquiry is whether a reasonable jury could find the defendant guilty of murder beyond a reasonable doubt under a currently valid theory. The Sixth Appellate District recently disagreed with the holding of *Duke*, instead concluding "section 1170.95 requires the prosecutor to prove beyond a reasonable doubt each element of first or second degree murder under current law in order to establish ineligibility" for relief. (*People v. Lopez* (2020) 56 Cal.App.5th 936, 942, 949 (*Lopez*), review granted February 10, 2021, S265974; see also *People v. Rodriguez* (2020) 58 Cal.App.5th 227, 230-231, 241, 243-

244 (*Rodriguez*), review granted March 10, 2021, S266652 [rejecting the standard articulated in *Duke* and approving *Lopez*].) We agree with the standard articulated in *Lopez*.

Although he does not raise the argument in his opening brief, in his reply brief, Lowe contends the trial court used the incorrect legal standard when it concluded he was ineligible for relief. Lowe has forfeited his argument by failing to raise it in his opening brief. (*People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9 (*Duff*).) Even assuming he had not forfeited the argument, we reject it. The trial court correctly applied the legal standard articulated in *Lopez* and approved in *Rodriguez*, concluding the prosecution had "proven beyond a reasonable doubt that petitioner is ineligible for resentencing because he could be convicted of first or second degree murder under the current law after Senate Bill 1437 went into effect . . . ."

We now turn to whether the trial court's finding is supported by substantial evidence. We conclude that it is.

Intent to kill for purposes of murder, also known as express malice, is shown when the assailant either desires the victim's death or knows to a substantial certainty that death will occur. (*People v. Smith* (2005) 37 Cal.4th 733, 739 (*Smith*); *In re M.S.* (2019) 32 Cal.App.5th 1177, 1185; see § 188, subd. (a)(1).) Evidence of motive, although not required to establish intent to kill, is often probative of intent to kill. (*Smith*, *supra*, 37 Cal.4th at pp. 740-741.) Intent to kill may be inferred from the defendant's acts and the circumstances of the crime. (*Ibid.*) Guilt as a direct aider and abettor requires: (1) knowledge of the direct perpetrator's intent to commit the crime; (2) intent to assist in committing the crime; and (3) conduct that in fact assists in committing the crime. (*People v. Perez* (2005) 35 Cal.4th 1219,

1225 (*Perez*).) The defendant must not only know the direct perpetrator's intent, he must share that intent. (*People v. Beeman* (1984) 35 Cal.3d 547, 560.) Senate Bill No. 1437 "did not . . . alter the law regarding the criminal liability of direct aiders and abettors of murder because such persons necessarily 'know and share the murderous intent of the actual perpetrator.' [Citations.]" (*Lewis*, *supra*, 43 Cal.App.5th at p. 1135.) "One who directly aids and abets another who commits murder is thus liable for murder under the new law just as he or she was liable under the old law." (*Ibid.*)

Applying these principles, we conclude substantial evidence supports the trial court's finding that Lowe was a direct aider and abettor who harbored the intent to kill. As stated in our 1997 opinion, "The day before the [murder] Lowe was present at the meeting in Mentzer's apartment during which the plan to kidnap Radin was discussed. Mentzer stated he was being paid a 'lot of money' by Greenberger for the job. Lowe was described by Mentzer in the meeting as the person who would drive Radin and Greenberger in the limousine to a location where he would permit Mentzer and Marti to enter and Greenberger to exit, and would then drive the forcibly detained Radin to the desert where Mentzer and Marti would try to extract information regarding the stolen drugs and money from him. Mentzer and Marti were to be armed with guns and explosives, which were plainly visible during the meeting. The scheme was executed as planned. Thereafter, Lowe received payment of money and a car." (*Greenberger*, *supra*, 58 Cal.App.4th 298, 372.) As the trial court similarly explained in denying the petition, Lowe "was present when Mentzer stated they would kidnap Radin, try to get information regarding [Greenberger's] money, then take him to

14

the desert where they would shoot Radin and blow up his face to prevent his identification."[7] Knowing what they had planned, Lowe decided to help Mentzer and Marti. He drove the limousine used for the kidnapping and murder. In sum, the evidence showed Lowe participated in the murder, driving the limousine while knowing Radin would be shot and killed. Based on these facts, we conclude the trial court's findings are supported by substantial evidence. (See *Perez*, *supra*, 35 Cal.4th at p. 1225; *Smith*, *supra*, 37 Cal.4th at p. 739.)

Lowe argues that, because some of the evidence admitted at his original trial should have been excluded, the trial court's 1170.95 ineligibility determination is unsupported by substantial evidence. Lowe raises this argument specifically in relation to statements made by codefendant William Mentzer in a tape recorded conversation with undercover operative William Rider. Lowe appears to argue that, because the trial court erred by admitting these statements, which included Mentzer telling Rider that Lowe drove the limousine on the night of the murder, the trial court should have disregarded them during the 1170.95 hearing. In support of this contention, Lowe notes that the United States Supreme Court's plurality decision in *Lilly v. Virginia* (1999) 527 U.S. 116 [119 S.Ct. 1887, 144 L.Ed.2d 117] may have cast doubt on this court's conclusion in *Greenberger*

---

7      Lowe claims the testimony about this planning conversation should be disregarded because it came from unreliable sources, namely Korban and Plzak. We reject this contention. "[I]t is the exclusive province of the trial judge or jury to determine the credibility of a witness[.]" (*People v. Jones* (1990) 51 Cal.3d 294, 314.) It is not our role to second guess the trial court's decision to take Korban and Plzak's testimony and the other evidence contained in the record of conviction at face value.

15

that the trial court did not err by admitting the tape recordings at the original trial.[8] We reject this contention for several reasons.

First, Lowe admitted to driving the limousine on the night of the murder during his own separate taped conversation with Rider. These statements were admissible as declarations against penal interest. (See Evid. Code, § 1230.) Thus, even if the trial court had completely disregarded Mentzer's conversation with Rider, this would have had no impact on its determination that Lowe was ineligible for section 1170.95 relief, because Lowe's admissible conversation with Rider separately provided the inculpatory evidence.

Second, as the Attorney General points out, this court already found the recordings were properly admitted. (See *Greenberger, supra*, 58 Cal.App.4th at pp. 330-331.) The "'"law of the case . . . must be adhered to throughout [the case's] subsequent progress, both in the lower court and upon subsequent appeal.[ ]'" [Citation.]" (*People v. Barragan* (2004) 32 Cal.4th 236, 246.) "Absent an applicable exception, the doctrine 'requir[es] both trial and appellate courts to follow the rules laid

_____

8 Lowe cites to *People v. Schmaus* (2003) 109 Cal.App.4th 846, 857, which, in dictum, noted: "The plurality's decision in *Lilly, supra*, 527 U.S. 116, does cast doubt on the continuing validity of aspects of *People v. Greenberger* (1997) 58 Cal.App.4th 298, 330-331 [ ], in which the Court of Appeal held that 'admission of a statement possessing sufficient indicia of reliability to fall within the hearsay exception of a declaration against penal interest does not deny a defendant the right of confrontation guaranteed by the United States Constitution' and that the determination of whether a statement is trustworthy is entrusted to the discretion of the trial court to be reviewed under an abuse of discretion standard. [Citations.]"

down upon a former appeal whether such rules are right or wrong.' [Citation.]" (*Ibid.*) Lowe, in his reply brief, has not refuted the Attorney General's contention that the law of the case doctrine applies, nor has he argued his case falls within an exception to that doctrine. He has therefore provided this court no basis for rejecting the Attorney General's position.

Lowe also argues "the constitutional minimum was not satisfied" concerning whether he was a major participant who acted with reckless indifference to human life. Lowe's argument is puzzling. The trial court did not deny Lowe's petition on the basis that he was a major participant in the kidnapping who acted with reckless indifference to human life. It denied it based on the conclusion that he directly aided and abetted the murder while harboring the intent to kill. Because the trial court did not deny Lowe's petition on the basis he now challenges, we need not resolve his argument.

We likewise address another tangential point raised by Lowe. In his opening brief, Lowe asserts: "Under the law as it is today, [a]ppellant's second degree murder conviction *and the aggravated kidnaping* [sic] *conviction* would not stand, as both were based on the natural and probable consequences doctrine, which is no longer good law." (Italics added.) Similarly, in his reply, Lowe contends that "because the murder and kidnapping were pleaded and argued by the prosecution as one course of conduct, if appellant did not aid and abet murder, the section 209 kidnapping conviction must also be vacated." Although he does not say so explicitly, Lowe appears to be asserting section 1170.95 renders him eligible for resentencing on his kidnapping conviction. This is incorrect because, as discussed above, section 1170.95 applies only to certain murder convictions.

Lastly, the Attorney General argues even if the trial court did err in denying the petition, Senate Bill No. 1437 and section 1170.95 could never afford Lowe any meaningful relief. In support of this contention, the Attorney General points out Lowe's sentence for his murder conviction was stayed, and he is serving an LWOP sentence for the kidnapping conviction. Because we conclude the trial court's ineligibility finding is supported by substantial evidence, we need not reach the Attorney General's point.

## DISPOSITION

The order denying Lowe's section 1170.95 petition is affirmed.

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

CURREY, J.

We concur:

MANELLA, P.J.

WILLHITE, J.

18